**UNITED STATES of America,**

v.

**Marc A. MADISON, a/k/a "Stanley Johnson", Defendant.**

**No. 90 Civ. 161 (RPP).**

United States District Court, S.D. New York.

Aug. 7, 1990.

Otto Obermaier, U.S. Atty., S.D.N.Y., New York City, Jonathan N. Halpern, for U.S.

Leonard F. Joy, Federal Defender Services Unit, New York City, for defendant.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is a motion to suppress statements made by defendant Marc A. Madison ("Madison") and evidence alleged to have been in the possession of Madison on March 9, 1990 when he was approached by detectives from the Port Authority Police Department on board a bus at the Port Authority Terminal ("the Terminal") in Manhattan, New York. The motion, brought on the grounds that Madison's Fourth Amendment rights were violated, is opposed by the government.

The Court held hearings on June 15, 1990 and June 22, 1990 at which Detective Sergeant Richard Canale ("Canale") and Detective Elizabeth Danese ("Danese") testified, respectively. Madison decided not to testify. The motion is supported by an affidavit from Madison, and the Court has received memoranda of law from both sides. Oral argument was heard on July 3, 1990.

### Findings of Fact

The Port Authority Police Department's Drug Interdiction Program is conducted in cooperation with the federal Drug Enforcement Agency to stem the flow of drugs from New York City to outlying areas by buses leaving from the Terminal. On March 9, 1990, a team of Port Authority police detectives, consisting of Canale, Danese, and Sergeant Rullo, entered the Terminal at approximately 12:30 P.M. to begin a day of narcotics interdiction. The officers were all dressed in plain clothes with their guns concealed.

The standard operating procedure for the team is for its leader, Canale, to select an individual for observation. Canale has patrolled the Terminal for approximately thirteen years and is well-known among many individuals at the Terminal as a law enforcement figure; therefore, he often assigns another member of the team to conduct the observations of the individual whom he has selected. After the subordinate detective reports his or her observations, Canale then decides whether or not to approach and interview the individual. When Canale approaches an individual he identifies himself as a police officer, asks whether the individual would be willing to talk with him, and, if so, attempts to start a conversation about the person's residence and travel plans. If the individual had been observed carrying luggage and assents to conversation, Canale will ultimately ask about that luggage. Often the individual will deny ownership of the luggage he or she had been seen carrying and Canale will then proceed to search the luggage. Tr. 96.

The evidence is that all decisions with regard to the approach of Madison were made exclusively by Canale and that the only role played by others was in providing information to Canale. The issue of whether there was a constitutionally adequate degree of suspicion to conduct any searches or seizures thus depends upon an objective review of the perspective of Canale, the detective who decided to conduct the search or seizure. *See United States v. Oakes*, 560 F.2d 45, 61 (2d Cir.1977). Accordingly the findings of fact focus on the information of which Canale was aware.

Slightly after 12:30 P.M. on March 9, 1990, Canale noticed Madison, a 21 year old African American male, holding a small black knapsack while standing in a line of approximately twelve to fifteen people at Gate 420 in the Terminal. Canale was aware that the line was for the bus scheduled to board between 12:50 P.M. and 12:55 P.M. and then to depart at 1:00 P.M. for New Brunswick, New Jersey. He also knew that, according to the schedule, a bus had just departed at 12:30 on that same route. Tr. 41.

Canale testified that Madison attracted his attention because he "was rocking back and forth in his place on line, and, as people passed him by, [Madison] would appear to be turning his head to look at those people." Tr. 14 (June 15, 1990). Canale observed this behavior for two to three minutes from a distance of approximately fifteen to twenty feet. Tr. 14, 16. During those two to three minutes Canale again saw that Madison

> had actually turned his head, and actually followed with his head, people passing down the bus terminal corridor almost until they were out of sight, almost looking over his shoulder as they passed.

Tr. 14, 56–57. Canale then assigned Danese to observe Madison. While Danese observed Madison from a distance of approximately fifteen feet, Canale stepped into a position from where he could neither be seen by Madison nor make observations of Madison, but from where he could see when Madison's bus would begin to board.

At approximately 12:50 P.M., the bus began to board. At that time, Canale ap-

proached Danese to receive a report that Madison had

> continued the action that he was involved in, the shifting of the weight and looking at people while he was in line. He began to hold the bag behind him with both hands, and there came a time when an individual wearing a windbreaker with a New Jersey state police emblem on it. . . . walked by him, and Mr. Madison, according to Detective Danese, appeared to look at him and looked away very quickly. . . . . The person [wearing the windbreaker] passed him again and sat down. Just at that time, a uniformed police officer passed Mr. Madison. . . . Mr. Madison saw him, stared at him, and stared at him until he was out of sight, looking over his shoulder, and at that time she said he became even more animated, his motions became more amplified basically.

Tr. 18–20.[1] Madison's bus began to board approximately thirty seconds after the man wearing the windbreaker and the uniformed officer passed him. Tr. 116, 147.

Danese and Canale had their conversation at the front of the outside of the bus, while Madison boarded. Canale then inserted himself in the line and boarded the bus. The bus is divided by a narrow aisle with rows of two seats on each side of the aisle. Canale spotted Madison sitting in a window seat approximately two-thirds of the way back in the bus. Canale then walked toward Madison. When Canale was "[t]o his [Madison's] side in the aisle," he took out his police shield, identified himself and asked Madison if he would speak to him. Tr. 26. Canale then utilized the aisle seat in the row directly behind Madison. Canale explained that he continued

his conversation by having "the top of my head leaning over into the [aisle] seat" in Madison's row, Tr. 68, 72, 124, so that he could face Madison, who remained in the window seat in the row in front of Canale. Tr. 73. Throughout Canale's ensuing conversation with Madison there were other passengers boarding and the testimony of the detectives is that the aisle was not consistently clear. Tr. 34, 125, 175. Detective Danese followed Canale on board the bus and placed herself two rows in front of Madison, on the opposite side of the aisle, standing with one knee resting on the aisle seat, "looking straight back" at Madison and Canale. Tr. 178, 179.

In a "conversational and polite," Tr. 27, tone, Canale then asked Madison what his destination was. Madison replied New Brunswick, New Jersey, the destination of the bus. Canale inquired next about where Madison had stayed in New York. Madison answered that he had stayed in Manhattan with friends.

Canale then proceeded to ask Madison if he had any luggage. Madison denied having luggage and in response to Canale's follow up questions denied ownership of the black knapsack, which had been placed under Madison's coat on the aisle seat next to Madison. After asking several other passengers if they owned the knapsack, Canale then displayed his police shield to the entire bus and in a loud voice asked if anybody owned the knapsack. After again asking Madison if he owned the knapsack and again receiving a denial, Canale opened the bag and pulled out a brown paper bag in which he found a substance he believed to be crack-cocaine. Canale proceeded at all times without seeking a warrant.

---

**1.** Danese testified that she also told Canale that Madison became "statue-like" for a brief period when the uniformed officer passed by him. Tr. 115. However, Danese made no reference to Madison ever freezing, becoming "statue-like" or appearing rigid in any of her written reports of her observations of Madison. She only wrote that Madison followed the uniformed officer with his eyes and then became more animated. More importantly, Canale recalled only that Danese told him that Madison's sighting of the uniformed officer was followed by Madison following the officer with his eyes and then becoming more animated. Accordingly, the Court finds that Canale was aware that Madison had stared at the uniformed officer but that Canale was not aware that Madison had become "statue-like" at the sight of the uniformed officer.

Danese also claims to have told Canale that Madison had transferred a piece of paper from his hand into his right back pants pocket without letting go of the bag. Tr. 119. Canale also made no reference to knowledge of or reliance on such an observation. However, Canale was aware that Madison continuously held his knapsack behind his back.

Madison was arrested and removed from the bus. Detective Rullo was outside the bus. As the trio of Canale, Madison and Danese stepped off the bus, Danese told Madison his *Miranda* rights and escorted him to her office, where Madison was again told his *Miranda* rights. Madison then waived his rights and made incriminating statements about his participation in the buying and selling of narcotics.

## Conclusions of Law

The defendant claims that he had been illegally seized at the time that Canale questioned him as to whether he owned the knapsack and therefore the subsequent denial of ownership, seizure of the knapsack, search of the knapsack's contents, arrest of defendant, and post-arrest statements of defendant should be suppressed as fruits of an illegal seizure. The government contends that the search of the bag was conducted pursuant to a voluntary and knowing denial of ownership; that a seizure never took place before Madison denied ownership of the knapsack; and that at the time Canale asked Madison if he had any luggage, Canale possessed an adequate degree of suspicion to justify a restriction of Madison's freedom.

The Fourth Amendment states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The threshold issue in this Fourth Amendment inquiry is whether a seizure by a government official occurred and, if so, at what point did it occur. The Court then can proceed to determine what type of seizure occurred and if that seizure was conducted in accordance with the applicable Fourth Amendment standard.

## A. Seizure

■ The test adopted by the Supreme Court "provides that the police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). The "free to leave" test is governed by an objective "reasonable person" analysis of the confrontation from the perspective of the individual confronted. *Chesternut,* 108 S.Ct. at 1979–80; *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. A "show of authority" by the police can result in a situation in which an individual is not "free to leave." *Brower v. County of Inyo,* 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968).

Courts have held that a seizure did not occur under the "free to leave" test when law enforcement officials have confronted individuals on a public concourse at an airport, *Mendenhall,* 446 U.S. at 554–55, 100 S.Ct. at 1877–78;[2] in a factory, *I.N.S. v. Delgado,* 466 U.S. 210, 218, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984); in a public street, *Chesternut,* 108 S.Ct. at 1980, *United States v. Moreno,* 897 F.2d 26, 31 (2d Cir.1990) ("chance street encounter"), cert. denied, —— U.S. ——, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990); and on an Amtrak train, *United States v. Tavolacci,* 895 F.2d 1423 (D.C.Cir.1990), *United States v. Carrasquillo,* 877 F.2d 73 (D.C.Cir.1989). In all of these cases, the location provided ample opportunities for the individuals to leave the presence of the officers without engaging in an act which would be contrary to their interests or raise a reasonable suspicion. Proceeding onward through the airport concourse or down the public street are quite reasonable acts, are not obviously against the ordinary interests

---

**2.** Only two Justices joined this portion of the Opinion of the Court; four dissenting Justices would have held that the encounter constituted a seizure; and three concurring Justices did not reach the issue, but noted that the question of whether a seizure had occurred was "extremely close." 446 U.S. at 560 n. 1, 100 S.Ct. at 1880 n. 1.

of the individual and do not raise reasonable suspicions. The factory in *Delgado* and the Amtrak trains in the D.C. Circuit are environments which offered a similar degree of mobility which the government officials did not restrict. The workers in *Delgado* sacrificed no liberty by leaving the presence of agents and moving to other portions of the factory. Indeed, as a result of the mobility offered by the factory environment, the I.N.S. agents were unable to question many of the workers even though those workers never left the factory. *See International Ladies' Garment Workers Union, AFL–CIO v. Sureck,* 681 F.2d 624, 627 (9th Cir.1982), rev'd, *I.N.S. v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Similarly, the individuals confronted on an Amtrak train could move to a dining car or just stroll down the wide aisle into another car with ease and without acting suspiciously or detrimentally to their interests. *See United States v. Cothran,* 729 F.Supp. 153, 155 (D.D.C.1990).

By contrast, cases in which courts have found seizures under the "free to leave" test involve confrontations in confined environments where departure from the government official's presence would require an abnormal departure from the course of conduct in which the individual had been engaged. Leaving the presence of the government official in such an environment would involve taking action manifestly contrary to the individual's interest.[3] For example, one is not "free to leave" when one is an occupant of a car which has been pulled over to the side of the road by a law enforcement agent. *See Berkemer v. McCarty,* 468 U.S. 420, 436–37, 104 S.Ct. 3138, 3148–49, 82 L.Ed.2d 317 (1984) (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979)). Even though a passenger could theoretically just continue his or her trip by foot, the Supreme Court recognizes that occupants of a car would not feel free to leave the scene of a traffic stop. *Ibid.* Indeed, that act would be such abnormal behavior as to raise the suspicion of any law enforcement official.

In circumstances closer to those here, several recent decisions by the District Court for the District of Columbia, as well as state courts using the *Mendenhall* test, have found that the circumstances of a narcotics agent's confrontation with an individual on a bus also constitute a seizure under the objective "free to leave" standard. *See United States v. Fields,* 733 F.Supp. 4 (D.D.C.1990); *United States v. Felder,* 732 F.Supp. 204 (D.D.C.1990); *United States v. Cothran, supra; United States v. Lewis,* 728 F.Supp. 784 (D.D.C. 1990); *Bostick v. Florida,* 554 So.2d 1153 (Fla.1990); *People v. Ginwright,* N.Y.L.J., May 29, 1990 (N.Y.Crim.Ct., Part 47) (Weissberg, J.).

In each of those cases, the scenarios were similar to the instant case. The agents approached young passengers who had already boarded a bus; the agents identified themselves as police; and then they politely asked the individuals basic questions about their identity and their travel plans. The buses had narrow aisles and, unlike the inside of the factory in *Delgado* or of an Amtrak train, the buses offered no place to which one might walk away from the presence of the agents unless one disembarked. In addition, the defendants were all approached in circumstances which rendered departure from the bus an impractical option: either the defendants were from out of town and unfamiliar with the area outside of the bus or the bus was about to leave and departure from the bus would have caused the defendant to miss his or her bus. None of the cases turned on the tone of speech utilized by the agents or a particular display of force, such as the exhibition of a gun, by the agents.

---

**3.** An individual need not be confronted in a confined environment for a finding that he is not free to leave. Other factors, such as the degree of intimidation resulting from the actions of the police, can result in an individual not being free to leave an encounter in a spacious or public environment. *See, e.g., United States v. Ceballos,* 812 F.2d 42, 47 (2nd Cir.1987) (seizure created by law enforcement agent's "stern request to accompany him to his field office").

The government relies on three circumstances to distinguish the on-the-bus seizure holdings from the fact scenario here. First, the government contends that in those cases there was an officer physically standing in the aisle. As the Florida Supreme Court stated, the partial blocking of the aisle "only underscore[s]" the conclusion that a seizure occurs when a young person is approached by police for questioning in an environment which offers no place to which the individual might practically walk away. Canale temporarily did block the aisle when he first approached Madison, identified himself, flashed his badge and asked if Madison would not mind answering some questions. Then while Canale conducted the questioning, his head occupied space between Madison and the aisle. Furthermore, a reasonable person would regard Danese as an accompanying police officer guarding access to the exit, because she maintained a standing position at the aisle seat staring straight back at Canale from two rows in front during the questioning. The aisle also was not an easily accessible exit because people were steadily boarding while Canale conducted his questioning. Moreover, a passenger, who leaves a bus, which is about to depart, while a police officer is attempting to question him, is engaging in suspicious behavior. The fact that Canale did not stand in the aisle throughout the entire questioning of Madison did not create the impression Madison was "free to leave."

The government's second argument is that in all of the holdings except *Ginwright*, the bus was stopped at the station while in transit to a different city. Thus, departure from the bus would have resulted in the defendant being stranded in a city which he had no intention of visiting and in some cases missing the opportunity to take a bus to his intended destination. Madison, on the other hand, was only on board a commuter bus. If he missed his bus, there was another one in another half hour. Moreover, spending additional time in New York would not have been a hardship since Madison was no stranger to New York City.

The Court finds the government's second argument to be without merit. Although, an individual may conceivably have less to lose by missing a commuter bus than by missing an in-transit bus, Madison still would have been engaging in abnormal and suspicious behavior and been subjecting himself to a significant restriction of his liberty interest in interstate travel had he taken it upon himself to leave the bus and spend another half hour in the Terminal. To the mindset of a reasonable traveler on a New York City commuter line, a half hour departure delay (after already waiting a half hour for the bus to arrive) is a considerable restriction. The option of leaving the bus would have inconvenienced Madison's freedom to travel to an extent that the Court finds that it was not an option which left him "free to disregard the police presence and go about his business." *Michigan v. Chesternut*, 108 S.Ct. at 1981.

The third distinguishing factor cited by the government is that there was only one law enforcement officer identified to Madison, while in *Fields* there were two. It is possible that a bombardment of interrogation from multiple officers could result in a seizure in an otherwise unconfined setting. However, the effect of the presence of multiple officers is not a basis for the on-the-bus seizure holdings, it is the nature of the bus setting and the context of the defendant's presence on the bus. *See, e.g., United States v. Lewis, supra* (only one detective approached defendant). Furthermore, the lack of activity and pose of Danese during the questioning could well have led defendant to conclude she must have been acting in concert with Canale. *See* Madison Aff. Accordingly, the government's third argument is without merit.

Based on the totality of the circumstances testified to at the hearings in this matter and discussed above, the Court finds that a reasonable person in Madison's position would not have felt free to leave the bus upon being confronted by Canale and then being questioned by Canale about his residence and travel plans. The bus offered no means for Madison to leave Canale's presence except by disembarking and this was not a reasonable option. Ma-

dison had just waited for the bus for almost a half hour and disembarking the bus would have involved a considerable inconvenience. In addition, a reasonable person would fear engaging in such a suspicious act as a sudden exit from a departing bus when he is being questioned by a police officer. In effect, Canale's actions "left him [Madison] no choice," *Sibron v. New York*, 392 U.S. 40, 63, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917 (1968), but to remain in his seat. Accordingly, the Court concludes that, under the "free to leave" test, a seizure had occurred by the time that Canale questioned Madison about his knapsack.[4]

■ To the extent that there is now a separate Fourth Amendment requirement that the law enforcement official subjectively intended to seize the defendant, *see Brower v. County of Inyo, supra,* the Court also finds that Canale acted intentionally in deciding to approach Madison on the bus, rather than in the Terminal, because in an on-the-bus encounter Madison would not have felt free to leave and would be more likely to engage in conversation, to have stowed his luggage and to deny ownership of the knapsack. Tr. 47, 61, 96.

This decision to follow the District of Columbia and state court on-the-bus seizure holdings does not "impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *Mendenhall* 446 U.S. at 554, 100 S.Ct. at 1877. Like Washington D.C. and the State of Florida, New York City has a serious drug trafficking problem. The Court is cognizant that the ability of law enforcement officials to approach individuals traveling through New York City's train and

bus stations is important to attempts to address this problem. Under this holding, law enforcement agents can still approach and question individuals without objective and particularized suspicion as long as the agents do not wait until the individual is cornered on board a bus which is about to leave. *See, e.g., United States v. Arango,* No. 89 Cr. 580, 1990 U.S.Dist. LEXIS 761 (S.D.N.Y. Jan. 25, 1990) (no seizure when agents question individual about luggage in Pennsylvania Station); *United States v. Liranzo,* No. 89 Cr. 878, 1990 WL 9324, 1990 U.S.Dist. LEXIS 872 (S.D.N.Y. Jan. 29, 1990) (no seizure when agents question individual standing in Port Authority Terminal).

### B. Reasonable Suspicion

■ The next stage in this Fourth Amendment inquiry is to determine whether the proper standard was followed in the decision to make the seizure of defendant on the bus. It is not disputed that the seizure was a brief, *Terry v. Ohio, supra,* investigatory detention. Such a seizure must be preceded by reasonable, articulable, objective, and individualized suspicion that criminal activity "may be afoot." *See United States v. Sokolow,* 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989); *Terry v. Ohio,* 392 U.S. at 30, 88 S.Ct. at 1884; *United States v. Buenaventura–Ariza,* 615 F.2d 29, 33 (2d Cir.1980).[5] A "hunch" is insufficient. *Sokolow,* 109 S.Ct. at 1585.

The Supreme Court instructs, "A court sitting to determine the existence of reasonable suspicion must require the agent to

---

4. The Supreme Court utilizes the "free to leave" test as the pertinent Fourth Amendment inquiry for determining whether a seizure of one's person has occurred. Accordingly, the issue of whether Madison was "free to refuse to talk" is pertinent to Madison's Fifth Amendment rights under *Miranda,* but is not the relevant inquiry for determining whether a seizure of one's person has occurred under the Fourth Amendment.

5. The government does not contend and this case does not invite a ruling that the detectives acted with a special need in this case beyond the normal interest in law enforcement. In a "special need" case the seizure would only have to satisfy the "bare reasonableness" standard,

which has no suspicion requirement and is satisfied when the government interest in conducting the seizure outweighs the seizure's infringement on private interests. *See Michigan Dept. of State Police v. Sitz,* —— U.S. ——, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (stopping motor vehicles for purpose of keeping the highways free of intoxicated drivers); *National Treasury Employee's Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (taking of urine from employees in safety-sensitive positions for drug testing); *Skinner v. Railway Labor Executives Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (same).

articulate the factors leading to that conclusion." *Sokolow*, 109 S.Ct. at 1587. The Supreme Court adds that it is permissible for those factors to come from a drug profile. The government has provided the Court with a copy of the Port Authority Police's drug courier profile. Court Ex. 1. Canale, however, referring to the document as "the dreaded profile," Tr. 97, testified that he "discounted" most of the factors on the profile in Madison's case and decided to approach Madison on the bus "basically [because of] the actions of the individual" and the fact that Madison had little or no luggage. Tr. 91.

The actions of Madison which Canale told the Court he considered are that:

(1) Madison "was rocking back and forth in his place on line, and as people passed him by would appear to be turning his head to look at those people." Tr. 14.

(2) Madison looked at a man wearing a windbreaker with a New Jersey state trooper emblem and then looked away quickly.

(3) Madison engaged in the activity of rocking and staring at people for almost 25 minutes. One of the people he followed with his eyes was a uniformed police officer. After following the officer with his eyes and only moments before boarding the bus, his rocking became more animated.

(4) Madison held on to his knapsack, at times tightly and with two hands, the entire time he was waiting on line.

The Supreme Court has noted that courts, when reviewing a law enforcement agent's articulation of reasonable suspicion, should be deferential to " 'certain common sense conclusions about human behavior.' " *Sokolow*, 109 S.Ct. at 1585 (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)). Here, however, there appears to be no "common sense" connection between the factors cited by Canale and an objective suspicion of criminal activity. The common sense conclusion from the factors is that Madison undoubtedly was a nervous person. Many people are nervous in the Terminal either because they are upset because they missed an earlier bus, because they are restless by nature or impatient, or because of the high rate of muggings and purse snatchings, and the population of homeless persons with mental or emotional problems. In addition, Canale was aware that Madison had just missed the 12:30 P.M. bus and would have to wait almost a half hour for the 1:00 P.M. bus.

Something more than merely being nervous while standing on line in a departure area is necessary for a reasonable suspicion of criminal activity. In *Sokolow*, for example, the Supreme Court held that there were grounds for a reasonable suspicion when agents were aware that the defendant "appeared nervous during his trip" *and* that "he paid $2,100 for two airplane tickets from a roll of $20 bills;" "he traveled under a name that did not match the name under which his telephone was listed;" "his original destination was Miami, a source city for illicit drugs;" "he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours;" and "he checked none of his luggage." 109 S.Ct. at 1583. Chief Justice Rehnquist, writing for the *Sokolow* Court, held, "Any one of these factors is not by itself sufficient proof of any illegal conduct and is quite consistent with innocent travel." 109 S.Ct. at 1586. *See also Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (plurality opinion) (reasonable suspicion of illegal drug trafficking exists when police are aware that defendant was nervous while walking through airport *and* was traveling under an assumed name; paid for ticket in cash with a number of small bills; was traveling from Miami to New York; and put his name but not his address on checked luggage); *United States v. Arango, supra* (reasonable suspicion exists when there is a nervous bagholder *and* (1) the bagholder is accompanied by a "spotter" who observes bagholder and scans terminal and (2) a group of men escort the bagholder to a train and then leave the area rapidly).

The factors other than nervousness cited by Canale do not raise the objective level of suspicion. Madison's reactions to the uniformed officer and the man with the windbreaker are similar to his reactions towards people manifesting no connection with law enforcement. Canale was aware that Madison had followed civilians with his eyes and head. And Madison's heightened animation just before departure is not inconsistent with the fact that he had been waiting for almost a half hour and was finally about to board.

Carrying only a knapsack is typical for a young man on a commuter bus, as opposed to taking a transatlantic flight with only a small bag. The detectives concede that nearly everybody traveling on the commuter buses had little or no luggage. Even Canale's testimony on the subject lacks confidence: "[L]ittle or no luggage, it could be a factor." Tr. 91. The consistent tight holding of the bag also bears no correlation to involvement in criminal activity when the potentially dangerous atmosphere of the Port Authority Terminal is the environment.

By comparison, the Supreme Court has held that reliance on the following four factors were inadequate to raise a reasonable suspicion: (1) arrival by airplane from a source city for cocaine, (2) arrival early in the morning when law enforcement activity is at a low ebb, (3) no luggage other than shoulder bags, and (4) appearing to be concealing the fact that one is traveling with a companion. *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980). Similarly, the Second Circuit held that there were insufficient grounds for reasonable suspicion of drug trafficking when agents were aware of an individual's nervous appearance *and* (1) his arrival from a source city and (2) his attempts to conceal the fact that he is traveling with a companion. *See United States v. Buenaventura–Ariza,* 615 F.2d at 35.

In a situation where the factors listed by the agent do not bear a common sense connection to an objective suspicion of criminal activity, the Court must look to the agent's articulation of why a circumstance raises an objective suspicion. The government elicited no such articulation from either Canale or Danese. The witnesses only indirectly supported their conclusions with vague and general references to his or her years of experience and exposure to training courses. Since the record provides no objective justification for the government's contention that Canale had a reasonable suspicion, the Court concludes that Canale acted on the subjective hunch of a skilled detective, but without the requisite level of objective suspicion.

The Court does not doubt the sincerity of Canale's subjective hunch; however, the Supreme Court requires that the detective provide an objective justification as a predicate for a finding of a reasonable suspicion. For example, in *Mendenhall,* there was a finding of reasonable suspicion based on testimony of agents "that drug couriers often disembark last in order to have a clear view of the terminal so that they more easily can detect government agents"; and "that drug couriers frequently travel without baggage and change flights en route to avoid surveillance." 446 U.S. at 564–65, 100 S.Ct. at 1882 (Powell, J., concurring). Here, the government failed to offer similar testimony as an objective foundation for a connection between Canale's observations and a reasonable suspicion of criminal activity. Accordingly, the seizure of Madison was illegal.

### C. Fruits of the Poisonous Tree

The government argues that regardless of the illegality of the seizure of Madison on the bus, the search of his bag and the subsequent arrest were not conducted in violation of the Fourth Amendment. The basis for the government's contention is Madison's statement that he did not own his knapsack. According to the government, that statement made the seizure and search of Madison's knapsack constitutional pursuant to the principle that one who intentionally abandons property loses Fourth Amendment standing to object to search or seizure of that property. *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960); *United States v. Moskowitz,* 883 F.2d 1142, 1147–48 (2d Cir.1989). In addition, Madison's

statement to Canale that he did not own the bag, with which Canale knew Madison to be traveling, would result in a sufficient level of suspicion for Canale to seize the bag.

Since Madison's denial of ownership was subsequent to an unconstitutional seizure of his person, the statement can only be relied upon by the government if the taint of the illegal seizure was removed by "an intervening act of free will." *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In all of the on-the-bus seizure cases cited above, the courts found that statements made by defendants denying ownership of luggage and granting consent to search their body or luggage were tainted by the illegality of the on-the-bus seizure, and therefore the subsequent seizures and searches and arrests were unconstitutional under the fruit of the poisonous tree doctrine. The Court does not go so far as to determine that Madison's denial of ownership was involuntary under *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), in holding that there was not an intervening act of free will which purges the taint of the illegal seizure of Madison's person. *See Florida v. Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 ("*Dunaway* [*v. New York*, 442 U.S. 200, 218–19, 99 S.Ct. 2248, 2259–60, 60 L.Ed.2d 824 (1979),] and *Brown* [*v. Illinois*, 422 U.S. 590, 601–02, 95 S.Ct. 2254, 2260–61, 45 L.Ed.2d 416 (1975),] hold that statements given during the period of illegal detention are inadmissable even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.") (citing *Wong Sun v. United States, supra*); *United States v. Lewis*, 728 F.Supp. at 787 & n. 4 (citing 3 W. LaFave, Search & Seizure § 8.2(d), at 190–91).

The Court finds that the taint of the illegal seizure was not purged when Madison denied ownership of the knapsack. Madison was in a coercive situation which he was not free to leave. He is only 21 years old and there is no evidence that he was seasoned in dealing with the police. He also had not been informed of his rights. Having a detective show his badge, dangle his head between your seat and the aisle, and make inquiries is an intimidating experience, rather than one which creates space for an act of free will. Moreover, there was not a long stretch of time, during which Madison could have relaxed, between the seizure of Madison's person and the making of the statement denying ownership. The illegal seizure taints Madison's denial of ownership. Consequently, the warrantless seizure and search of the knapsack and arrest of Madison are tainted as fruits of an unconstitutional seizure.

The government has also failed to satisfy its burden of showing that the post-arrest statements of Madison were untainted. *Brown v. Illinois*, 422 U.S. at 604, 95 S.Ct. at 2262. Even though Madison had been read his *Miranda* rights upon his arrest, the government has not shown any indication that in the hours following the tainted search and seizure and the tainted arrest there was any "intervening event of significance whatsoever." *Id.* at 605, 95 S.Ct. at 2264. The Court finds that the post-arrest statements were the fruit of the tainted pre-arrest actions of the detectives.

### Conclusion

Defendant's motion to suppress is granted with respect to his statements denying ownership of the knapsack, the evidence seized after those denials of ownership, and the post-arrest statements.

IT IS SO ORDERED.