**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Victor Fran WIGGINS,
Defendant-Appellant.**

**No. 87–5048.**

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 13, 1987.

Decided Sept. 21, 1987.

Clifton Harviel (argued), Asst. Federal Defender, Memphis, Tenn., for defendant-appellant.

W. Hickman Ewing, U.S. Atty., Memphis, Tenn., Timothy R. DiScenza (argued), for plaintiff-appellee.

Before MILBURN and RYAN, Circuit Judges, and EDWARDS, Senior Circuit Judge.

MILBURN, Circuit Judge.

Pursuant to Fed.R.Crim.P. 11(a)(2), defendant-appellant appeals from his conviction for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Defendant argues that the district court erred by denying his motion to suppress the cocaine found in his luggage because he consented to the search only

after having been subjected to a warrantless arrest made without probable cause. Because we agree with the district court that defendant's seizure did not exceed the boundaries of a limited investigative detention, we affirm.

## I.

On June 20, 1986, Drug Enforcement Administration (DEA) Agent Anthony F. Belovich received information from a confidential informant indicating that an individual would be aboard a Republic Airlines flight from Miami to Memphis and that the individual would be in possession of approximately three kilograms of cocaine. The confidential informant related to Agent Belovich that the individual would be traveling under the name of James West. With the assistance of airport police, Agent Belovich contacted Republic Airlines and determined that there was a flight from Miami to Memphis scheduled to arrive at 3:00 p.m. that same afternoon. The airline was unable to find a James West aboard, but related that a James Way was aboard and that he was seated in seat number 19–E. Agent Belovich then asked the FAA air traffic controller to contact the aircraft while it was still in flight in order to obtain the description of the individual seated in seat number 19–E.

Agent Belovich, accompanied by Special Agent Richard Holmes and Sergeant Chambers of Metro Narcotics, went to the gate where the passengers on the flight from Miami would disembark. Based on the description supplied by the controller, Agent Belovich was able to identify defendant as the individual that would be in possession of the cocaine. Defendant was observed as he disembarked the plane in possession of a brown-colored, medium-sized Samsonite suitcase. The agents followed defendant to the airport terminal exit where they stopped him and identified themselves to him.

The agents asked defendant Wiggins to accompany them to the airport police office for an interview, which he voluntarily agreed to do. Defendant was not told that he had to go to the airport police office and, in fact, was told that "if he wanted to leave he could at any time." While walking beside defendant Wiggins to the airport police office, Agent Belovich asked to see defendant's airline ticket, which indicated the name James Way. Once the agents and defendant reached the airport police office, Agent Belovich asked to see defendant's driver's license, which indicated the name Victor Wiggins. Defendant was unable to explain the discrepancy, stating that "he didn't know the name James Way was on the airline ticket."

The agents asked for consent to search defendant's suitcase but he refused. The agents then indicated to defendant that they were going to have a trained dog sniff the suitcase in order to determine if there were narcotics in it, and when the agents placed the suitcase among other luggage, the trained dog walked by the defendant's suitcase and alerted the agents to the presence of narcotics. Although defendant was not told of the results of the agents' use of the dog, defendant Wiggins consented to a search of his suitcase. Defendant was detained for approximately ten minutes between the time of the initial stop and his consent to the search.

## II.

The sole issue presented is whether the detention of defendant was a full-blown arrest, requiring probable cause, or whether it was an investigative detention, requiring only a reasonable suspicion of criminal activity. In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Court "recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers*, 452 U.S. 692, 697–98, 101 S.Ct. 2587, 2591–92, 69 L.Ed.2d 340 (1981). The Court reasoned that the substantial government interests in preventing crime and ensuring the safety of police officers justify some but not unlimited intrusion on the individual's interests, providing the police have a reasonably articulable basis to suspect criminal activity. *Id.* at 697–99, 101 S.Ct. at 2591–92.

■ The balancing of the government's interests against the individual's interests demands that an investigative detention "be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). In this regard, the reviewing court must "consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985). An investigative detention "is too long in duration" if the police have not "diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 1575.

Moreover, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d 229 (1983) (plurality opinion). However, the fact that the reviewing court may conceive "some alternative means by which the objectives of the police might have been accomplished ... 'does not, in itself, render the search unreasonable.' The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it." *Sharpe*, 105 S.Ct. at 1576 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973)).

The Court in *Royer* set out the permissible bounds of an investigative detention in the context of airport stops and searches. Royer aroused the suspicions of two detectives stationed at the Miami Airport because his "appearance, mannerisms, luggage, and actions fit the so-called 'drug courier profile.'" 460 U.S. at 493, 103 S.Ct. at 1322. The two detectives approached Royer, identified themselves as police officers, and asked if he "had a 'moment' to speak with them." *Id.* at 494, 103 S.Ct. at 1322. Royer answered affirmatively, and the detectives asked to see his airline ticket and driver's license. *Id.* Royer's airline ticket and driver's license bore different names. *Id.*

The detectives informed Royer that they were narcotics investigators and that they had reason to suspect him of transporting narcotics. 460 U.S. at 494, 103 S.Ct. at 1322. The detectives did not return Royer's airline ticket and driver's license, but asked him to accompany them to a room adjacent to the concourse. *Id.* Royer's luggage was brought to the interrogation room, and he was asked if he would consent to a search of his suitcases. *Id.* Royer opened one suitcase and did not object to the search of the second suitcase. *Id.* at 494–95, 103 S.Ct. at 1322. The search of the two suitcases revealed a sizable quantity of marijuana. *Id.* at 495, 103 S.Ct. at 1322.

The *Royer* plurality found that "when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart," Royer was the subject of an investigative detention. 460 U.S. at 501, 103 S.Ct. at 1826. The plurality further found that "when the officers discovered that Royer was traveling under an assumed name, this fact, and the facts already known to the officers," were a sufficient basis for temporarily detaining Royer and his luggage. 460 U.S. at 502, 103 S.Ct. at 1327. The plurality noted that if Royer had consented to the search of his luggage while he was being detained on reasonable suspicion, the marijuana discovered in the suitcase would have been admissible. *Id.*

However, the *Royer* plurality found that by the time Royer consented to the search of his suitcases, the investigative detention had ripened into a full-blown arrest. "What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." 460 U.S. at 503, 103

S.Ct. at 1327. The plurality explained that the detectives' conduct was "more intrusive than necessary to effectuate an investigative detention" because the detectives asked Royer to accompany them to the interrogation room without returning his airline ticket and driver's license and without informing him that he was free to depart. *Id.* at 504–05, 103 S.Ct. at 1328. The plurality also explained that the detectives had not employed the most expeditious means of investigation because it was possible for the detectives to have used a trained dog to quickly detect the presence of narcotics. *Id.* at 505, 103 S.Ct. at 1328.

 Unlike *Royer*, the conduct of the officers in the present case was not more intrusive than was necessary to effectuate their investigation. The officers secured defendant's consent to an interview in the airport police office prior to obtaining his airline ticket and after informing him that he could leave at any time. The fact that defendant voluntarily accompanied the officers to the airport police room cannot form the basis for finding that the encounter was a full-blown arrest. *See United States v. Williams,* 754 F.2d 672, 675 n. 2 (6th Cir.1985). While it is conceivable that interrogation of defendant on the concourse would have been less intrusive, it cannot be said that the agents acted unreasonably in asking defendant to accompany them to the airport police office. *See Sharpe,* 105 S.Ct. at 1576; *United States v. Vanichromanee,* 742 F.2d 340, 345 (7th Cir.1984); *United States v. Porter,* 738 F.2d 622, 625 n. 2 (4th Cir.) (en banc), *cert. denied,* 469 U.S. 983, 105 S.Ct. 389, 83 L.Ed.2d 323 (1984).

Moreover, once defendant entered the airport police office, the officers resorted to the most expeditious means available to verify their suspicions, employing a trained dog, as was suggested by *Royer*, to quickly determine whether defendant's luggage contained narcotics. While the police could have retained defendant's luggage and permitted him to leave, the police did not act unreasonably in foregoing this alternative. *See Sharpe,* 105 S.Ct. at 1576; *United States v. Place,* 462 U.S. 696, 706 & n. 7,

103 S.Ct. 2637, 2644 & n. 7, 77 L.Ed.2d 110 (1983); *Royer,* 460 U.S. at 502, 103 S.Ct. at 1326. The trained dog was immediately available to smell the suitcase, and defendant had voluntarily consented to the interview in the airport police office.

Under these circumstances, we hold that defendant's detention did not exceed the boundaries of a permissible investigative detention. Since defendant has not challenged the finding that his detention was based upon a reasonable suspicion of criminal activity, we also hold that he was not being illegally detained when he consented to the search of his luggage. *See Royer,* 460 U.S. at 502, 103 S.Ct. at 1326–27.

### III.

Accordingly, the judgment of the district court is AFFIRMED.