UNITED STATES of America,
Plaintiff–Appellee,

v.

Andrew Matthew WINFREY, Jr.,
Defendant–Appellant.

No. 89–1361.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 16, 1989.
Decided Sept. 28, 1990.

I.

Andrew Matthew Winfrey, Jr. was arrested in June 1988 at the Detroit Metropolitan Airport following the discovery on his person of approximately two hundred fifty grams of cocaine. He was later indicted on one count of possession with an intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1). Winfrey moved to suppress all evidence confiscated by the officers, charging that the airport search and his arrest violated his rights under the fourth amendment of the Constitution. The district court denied Winfrey's motion to suppress, whereupon Winfrey entered a conditional plea of guilty to the count contained in the indictment, reserving, under Fed.R.Crim.P. 11(a)(2), the right to appeal the district court's adverse ruling on the motion to suppress. Winfrey was sentenced to thirty-three months of incarceration.

Thomas A. Ziolkowski, Asst. U.S. Atty., David Debold (argued), John R. Roth, Asst. U.S. Atty., Office of the U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Jill L. Price, Claretta J. Varner (argued), Rafael C. Villarruel, Federal Public Defenders Office, Detroit, Mich., for defendant-appellant.

Before KRUPANSKY and RYAN, Circuit Judges, and JOHNSTONE, Chief District Judge.*

RYAN, Circuit Judge.

Defendant Andrew M. Winfrey, Jr. appeals the decision of the district court denying his motion to suppress evidence discovered during a search of his person by officers of the Wayne County, Michigan, Sherriff's Department and the Drug Enforcement Administration (DEA) at the Detroit Metropolitan Airport.

We find no fourth amendment violation, and affirm.

II.

During the evening of June 8, 1988, four officers of the Wayne County Sheriff's Department—Jerry Adams, Steve Burke, and two others—assigned to routine patrol of an indoor parking facility at the Detroit Metropolitan Airport, noted that a blue Ford Taurus parked in the garage was missing all of its wheel covers. Suspecting the vehicle had been vandalized, the officers decided that it merited closer scrutiny. The officers observed several rolls of cash bound with rubber bands, and a prescription medicine vial on the vehicle's front seat.[1] A record check of the vehicle's license plate revealed that the automobile was not stolen, and that there were no warrants outstanding against its female owner. On the basis of the roll of cash and the empty prescription vial on the front seat, the officers suspected that the vehicle could have some connection to narcotic activity. The deputies then contacted the airport office of the DEA. Shortly thereafter, Officer David Gentry, a Michigan

---

* The Honorable Edward H. Johnstone, Chief Judge of the United States District Court for the Western District of Kentucky, sitting by designation.

1. It was later determined that there was approximately $2,500 in the automobile.

State Police officer assigned to a special DEA drug interdiction task force at the Detroit airport, arrived at the garage along with Special Agent Charles Moffitt of the DEA. After conferring with Gentry and Moffitt, and at Gentry's direction, the officers already on the scene placed the automobile under surveillance. Gentry and Moffitt then went to the terminal building in order to observe passengers arriving on incoming flights.

Approximately ninety minutes after first placing the Taurus under surveillance, the officers observed Winfrey, who was carrying a garment bag and a briefcase, enter the parking garage and prepare to enter the vehicle. The four officers approached Winfrey, identified themselves as police officers, and requested permission to ask a few questions. There was conflicting evidence as to whether any of the Wayne County officers were in uniform, but the record discloses that at least one of the plainclothes officers had a pistol holstered at his hip.

The officers initially questioned Winfrey about his presence in the garage and then asked to examine his driver's license, automobile registration, and his airline ticket. It was apparent from the automobile's certificate of registration that Winfrey was not the owner of the vehicle and that it was registered to a woman whose address was different than the address that appeared on Winfrey's driver's license. When asked to explain why he was driving someone else's car, Winfrey responded that the car belonged to his live-in girlfriend and that he was using it with her permission. Comparison of Winfrey's driver's license with his airline ticket revealed that he had been traveling under the name of Andrew Matthews or Matthew Andrews. His name is Andrew Matthew Winfrey. Defendant claimed the ticket agent made a mistake and used his first and middle name rather than his last name.

The airline ticket indicated that Winfrey had just arrived in Detroit from Miami, Florida. In response to the officers' questions, Winfrey stated that he had been in south Florida for two days inquiring about purchasing a beauty salon in Fort Lauderdale, in partnership with his brother, and that upon his arrival in Florida he discovered that he had left his cash at home whereupon he immediately returned to Detroit. Upon a consensual search of Winfrey's briefcase, the Wayne County officers found no documentation or other evidence confirming the existence of the alleged beauty salon transaction or of any other business deal in south Florida. In response to the observation by one of the officers to the effect that he was traveling rather "light," Winfrey explained that he had left some of his luggage in Florida.

One of the Wayne County officers then asked Winfrey if he was carrying a firearm, and when Winfrey responded that he was not, the officer requested permission to search him. Winfrey consented, and the officer conducted the pat-down search and found no weapon. Officer Adams testified that he noticed a large bulge in Winfrey's groin area during the pat-down search, but allowed the search to conclude without comment.

A simultaneous consensual search of the automobile was conducted. The officers discovered nothing unusual or incriminating in the vehicle, beyond the $2,500 in cash and the prescription vial they had seen on the front seat.

The record indicates that as the Wayne County officers searched Winfrey and the automobile, they retained Winfrey's driver's license and the automobile's registration certificate, both of which Winfrey had voluntarily given to the officers. Winfrey was instructed not to retrieve the keys from the trunk of the vehicle and to keep his hands out of his pockets. When the consensual pat down and automobile search were concluded, Winfrey requested permission to proceed on his way but the Wayne County officers ordered him to wait with them for the return of the DEA agents. According to Winfrey, the officers said, "You can't leave now. We'll tell you when you can leave." Sheriff Deputy Adams testified that defendant was told he could not leave until DEA agents arrived. Sheriff Deputy Burke testified that defendant

never asked to leave but rather agreed to stay.

Sheriff Deputy Burke testified that agents of the DEA were again contacted and asked to return to the scene:

Having worked the airport for numerous years, and we have had the occasion to work with DEA in the past, the answers that I was getting from the subject, the fact that he didn't have the paperwork indicating any business deals had transpired [in Florida], it was unusual to have money on the front seat lying like that, and in the past we have discovered that people who carry money rolled up in wads of that nature have in fact been involved in drug dealings, and we thought it might be advisable for DEA to come and converse with this gentleman.

In approximately ten to fifteen minutes, the two DEA agents, Gentry and Moffitt, returned to the garage. Officer Gentry posed additional questions to Winfrey and requested that Winfrey permit him to conduct another pat-down search. Winfrey protested that he had already been searched and that, moreover, Gentry lacked a warrant to search either his person or the vehicle. According to Winfrey, the following exchange occurred between him and Gentry.

I told him, "Don't you have a search warrant?" I said, "I have been searched once already." He said "I can get a search warrant. Are you going to give me any trouble?" I said, "No, not with all these guns around here I am not going to give you any trouble." He smiled and said, "Everybody, Mr. Winfrey is giving me consent."

Gentry, who had purportedly been alerted by Officer Adams to the large bulge in Winfrey's groin area and had been apprised of all the circumstances giving rise to Winfrey's detention, proceeded to pat down Winfrey for a second time, discovering nearly two hundred fifty grams of cocaine cached in Winfrey's trousers. Winfrey was then formally placed under arrest.

### III.

Defendant contends the search of his person which uncovered the package containing cocaine was invalid as a "fruit" of an illegal seizure under the fourth amendment and that the cocaine ought to have been suppressed.

In his principal argument, Winfrey charges that the Wayne County officers scrutinized his conduct and approached him in the first instance merely because there was cash on the front seat of the automobile he had parked in the garage. This, in his view, was not a sufficient basis for the reasonable and articulable suspicion necessary to conduct an investigatory *Terry*-type stop. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Winfrey contends this case should be distinguished from those in which law enforcement officers form the requisite reasonable and articulable suspicion based upon an individual's conduct which is consistent with various objective behavioral manifestations of a classical "drug courier profile." Winfrey argues further that even if such a reasonable and articulable suspicion was validly formed, the limits of a proper *Terry* stop were exceeded in this case and that he was effectively arrested without probable cause when he was compelled to wait for the reappearance of the DEA agents and was then illegally subjected to a second pat-down search. Finally, Winfrey asserts that the district court erred in concluding that he voluntarily and intelligently consented to Officer Gentry's second pat-down search of his body.

The government contends that the entire confrontation consisted of four constitutionally distinct episodes. The first was the indisputably lawful inquiry by the officer concerning Winfrey's identity and the request to examine his driver's license, automobile registration, and airline ticket. The second was the consensual pat down, and search of Winfrey's briefcase and the automobile. The third was the nonconsensual, in custody, *Terry* seizure and search, and the fourth was the arrest upon discovery of the cocaine.

### A.

Not all encounters between the police and citizens are seizures within the meaning of the fourth amendment. *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968). Police questioning, by itself, does not result in a fourth amendment violation. *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). The request for, and examination of, an airline ticket and driver's license do not amount to a seizure under the fourth amendment. *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326; *see United States v. Collis*, 766 F.2d 219, 221 (6th Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985). Thus, the initial encounter and questioning by the four Wayne County officers in the instant case did not constitute an improper seizure within the meaning of the fourth amendment.

The second phase of the confrontation between Winfrey and the police, the indisputably consensual pat down and the search of Winfrey's briefcase and the automobile, did not raise any fourth amendment issues.

The third phase began with the direction to Winfrey to remain at the scene while DEA agent Gentry was summoned to return, and Winfrey's keys, driver's license, automobile registration, and airline ticket were retained by the officers. Clearly, these events did involve fourth amendment issues.

A seizure, within the meaning of the fourth amendment, occurs only when a reasonable person, in view of the circumstances surrounding the encounter with law enforcement officials, believes he is not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). We find that a reasonable person would conclude that Winfrey was seized for purposes of the fourth amendment when his driver's license, automobile registration, and keys were retained by the officers and he was

ordered to remain there until the DEA agents arrived.

We do not find that the seizure was supported by probable cause that a crime had been committed. However, a seizure under the fourth amendment need not necessarily be justified by probable cause. A temporary seizure under the fourth amendment may be justifiable if a reasonable articulable suspicion of criminal activity actually exists. *Terry*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968).

In *Royer*, the Supreme Court indicated that a temporary *Terry* detention for questioning on less than probable cause is warranted where the public interest involved is the suppression of illegal drug trafficking. *Royer*, 460 U.S. at 498–99, 103 S.Ct. at 1324–25. However, the scope of the detention is limited:

> [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

*Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26 (citations omitted). The government bears the burden of showing the seizure based on reasonable suspicion satisfied the conditions of an investigative *Terry* seizure. *Id.*

The reasonableness of an investigative stop, then, is a dual inquiry: 1) whether the officers' conduct is supported by articulable suspicion, and 2) whether the detention and investigative methods used were reasonable under the circumstances. *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Hardnett*, 804 F.2d 353, 356 (6th Cir.1986), *cert. denied*, 479 U.S. 1097, 107 S.Ct. 1318, 94 L.Ed.2d 171 (1987).

We find that the officers had an articulable and reasonable suspicion that Winfrey was engaged in drug trafficking. He was traveling from Miami, a source city, and under a name that was a variation of his own, but a variation that eliminated his surname. He had been in Miami only

two days. He had no documentation of any kind relating to the beauty salon business transaction he claimed was the purpose for the trip. Twenty-five hundred dollars in cash was found in the car, rolled in a way commonly found among drug traffickers. While each factor by itself may be insufficient to establish reasonable suspicion that a crime was committed, articulable suspicion is based on an evaluation of *all* the surrounding circumstances as viewed by those trained in the law enforcement field. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989), *United States v. Knox*, 839 F.2d 285, 290 (6th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989).

There is no question that the initial stop and the preliminary questioning were entirely lawful, and that the initial pat down and search of the automobile were consensual. The pivotal question is whether the temporary detention of Winfrey, while the officers waited for the DEA agents to return, was too long, under the circumstances, to be justified as a *Terry* stop.

In testing whether the temporary detention of Winfrey, following the consensual pat down and vehicle search, was a justifiable *Terry* stop in the first place and, if so, lasted too long to fit within the principle of the *Terry* rule, we triangulate: 1) the evolving fourth amendment *Terry* rationale; 2) *all* the circumstances as they occurred at the confrontation scene; and 3) the judgment of the sheriff deputies, who were not trained drug enforcement specialists, about what was occurring before them.

We are, of course, denied the benefit of considering the fact that the officers' suspicions proved to be well-founded, or that lawyers, schooled in the necessities of fourth amendment law, assessing the circumstances abstractly long after the event, might or might not have handled the situation differently.

### B.

■ There is no rigid time limitation on the lawfulness of a *Terry* stop. *United States v. Sharpe*, 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985).

In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... [T]he court should not indulge in unrealistic second guessing.... The question is not simply whether some alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

In *Sharpe*, the court held the twenty-minute detention of the defendant was not unreasonable, the police acted diligently and the detention did not involve any delay unnecessary to the legitimate investigation of the officers. 470 U.S. at 687, 105 S.Ct. at 1576.

■ Here, the officers diligently pursued a means of investigation that would dispel or confirm their suspicions quickly. The sheriffs had summoned the DEA agents to the scene and were directed by the DEA agents to watch the vehicle; the sheriffs resummoned the DEA agents to the scene after defendant's arrival based on the suspicious circumstances presented. The Wayne County officers detained defendant ten to fifteen minutes while awaiting the arrival of the summoned DEA agents. The sheriff's deputies were not trained as drug agents and needed the DEA agents' expertise to confirm or dispel their suspicions.

Without once again detailing all the facts and circumstances that existed at the airport parking deck, we think it is clear that there was an abundance of "articulable suspicion" to warrant a *Terry* stop; and we are unable to say that it was, as a matter of law, unreasonable, in the fourth amendment *Terry* stop sense, for the sheriff's deputies, given all they knew, to detain Winfrey another ten to fifteen minutes for agent Gentry's return in order that their suspicions could be quickly confirmed or

dispelled. A contrary conclusion would amount, we think, to the "second guessing" forbidden in *Sharpe*, 470 U.S. at 685, 105 S.Ct. at 1574–75.

The investigative methods used, and the temporary detention of Winfrey, were reasonable under the circumstances. Although the length of Winfrey's detention tested the outer limits of a *Terry* stop, we conclude the entire episode constituted an investigative *Terry* detention and not an arrest. Therefore, the cocaine recovered from his person during the pat-down search conducted by Officer Gentry need not be suppressed as "fruits" of an illegal seizure.

### C.

 Since the second pat down of defendant's person that resulted in discovery of the cocaine was not preceded by an impermissible seizure under the fourth amendment, defendant's consent, if voluntary, would legalize the pat-down search of his person. *United States v. Mendenhall*, 446 U.S. at 558, 100 S.Ct. at 1879. Whether consent to a search is voluntary is a question of fact to be determined from the totality of circumstances and will not be reversed on appeal unless clearly erroneous. *United States v. Rose*, 889 F.2d 1490, 1494 (6th Cir.1989) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973)).

The district court accepted the testimony of Officer Gentry that defendant consented to the second pat-down search, despite defendant's testimony to the contrary. Although we agree with the district court that the question of consent is a close one, we are not prepared to hold that the district court's finding of consent was clearly erroneous. *United States v. Garcia*, 866 F.2d 147, 151 (6th Cir.1989). Instead, we defer to the finding of the district court who, the parties agree, conducted an evidentiary hearing and concluded that defendant consented to this second search, a conclusion adequately supported by the evidence. This second search of defendant's person uncovered the cocaine which gave the officers probable cause to arrest defendant.

### IV.

For the foregoing reasons, the judgment of the district court overruling defendant's motion to suppress evidence discovered during the search of his person at Detroit Metropolitan Airport is AFFIRMED.

KRUPANSKY, Circuit Judge, concurring.

Because the arresting officers had probable cause to suspect Winfrey of engaging in drug courier activity *prior* to his detention pending the arrival of Officer Gentry of the DEA, and because the two searches of Winfrey's body—occurring over approximately a twenty-five minute period of time —would, absent probable cause, have constituted an impermissibly intrusive *Terry*-type stop, I concur separately in the panel majority's opinion.

An investigatory *Terry* stop must be "no more intrusive than necessary to fulfill the purpose of the stop." *United States v. Pino*, 855 F.2d 357, 362 (6th Cir.1988). "Moreover, 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *United States v. Wiggins*, 828 F.2d 1199, 1201 (6th Cir.1987) (quoting *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)).

The officers exceeded the outer limits of a permissibly scoped *Terry* stop when they patted-down Winfrey, found nothing, directed him to stay with them for an additional twenty to twenty-five minutes while Officer Gentry was summoned back to the parking garage, and then patted down his body *again*. It stretches the boundaries of the *Terry* stop beyond their tolerable limits to conclude that the detention—an encounter less intrusive than full-scale arrest because supported by a lesser standard of suspicion—may encompass two searches and a compulsory delay of nearly half an hour.

Although the scope of a permissible *Terry* stop was exceeded in the case at bar, no violation of the fourth amendment occurred

because the officers had probable cause to arrest Winfrey subsequent to the conduct of the first pat-down search. "Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'" *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). Probable cause is a "fluid concept" that turns on an ad hoc calculation of probabilities; it is not "reduced to a neat set of legal rules." *Id.*, 462 U.S. at 232, 103 S.Ct. at 2329. "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar*, 338 U.S. at 175–76, 69 S.Ct. at 1310–11. *Accord Dunaway v. New York*, 442 U.S. 200, 209 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979). "[P]robable cause means 'a fair probability that contraband or evidence of a crime will be found'...." *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332).

In view of this standard, the discovery by Officer Adams of a bulge in the crotch of Winfrey's trousers (a favorite place used by drug couriers to conceal drugs), coupled with the spectrum of unanswered questions that remained with respect to Winfrey's conduct after completion of the first pat-down frisk, unquestionably gave rise to the formation of probable cause necessary to detain Winfrey pending the arrival of law enforcement officers trained and expert in the field of narcotics interdiction. These additional facts, aggregated with all that was already known to the officers, gave rise to the probable cause necessary to detain—or arrest—Winfrey pending the re-arrival of the DEA agents.

Accordingly, I concur in the majority's judgment that the fruits of the encounter that occurred between Winfrey and the police in the Detroit Airport should not have been suppressed.