*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0280P (6th Cir.)
File Name: 02a0280p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
　　　*Plaintiff-Appellant,*

　　　*v.*

JOSHUA PAUL ORSOLINI,
　　　*Defendant-Appellee.*

No. 01-5508

>

Appeal from the United States District Court
for the Middle District of Tennessee at Cookeville.
No. 00-00008—William J. Haynes, Jr., District Judge.

Argued: July 16, 2002

Decided and Filed: August 20, 2002

Before: SUHRHEINRICH, SILER, and GILMAN, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Jimmie Lynn Ramsaur, ASSISTANT UNITED
STATES ATTORNEY, Nashville, Tennessee, for Appellant.
Jack D. Lowery, Jr., LOWERY & LOWERY, Lemanon,
Tennessee, for Appellee. **ON BRIEF:** Jimmie Lynn
Ramsaur, ASSISTANT UNITED STATES ATTORNEY,
Nashville, Tennessee, for Appellant. B. F. Jack Lowery, Sr.,
LOWERY & LOWERY, Lemanon, Tennessee, for Appellee.

1

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge.  In June of 2000, Joshua Paul Orsolini was pulled over for speeding by a Tennessee Highway Patrol officer.  Based upon the officer's observations and the initial questioning of Orsolini and his passenger, the officer suspected that Orsolini was involved in drug trafficking.  The officer therefore asked Orsolini for permission to search his car.  Orsolini at first agreed, but then revoked his consent.  The officer responded by calling a canine unit to the scene of the traffic stop.  Orsolini and his passenger were arrested after marijuana was found in the trunk of the car.

After being indicted for drug trafficking, Orsolini filed a pretrial motion to suppress the evidence that was found as a result of the above-described search.  The district court granted Orsolini's motion in March of 2001.  This interlocutory appeal was then filed by the government.  For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  Factual background

On June 30, 2000, Orsolini and a female passenger were driving east on Interstate 40 in Smith County, Tennessee. Orsolini was pulled over for speeding by Tennessee Highway Patrol Officer Billy Pierce at 3:11 p.m.  According to the radar gun measurement, Orsolini's car had been traveling in excess of 80 miles per hour.  The speed limit on the interstate was 65 miles per hour.

Pierce approached the car and asked Orsolini for his driver's license and vehicle registration. Orsolini gave Pierce a photocopy of an interim California driver's license and a bill

told Orsolini and his passenger that they were free to leave the scene of the traffic stop, and they actually left at 3:47 p.m. to travel with Officer Ferguson to the nearest interstate exit. After noting that the officers would not allow Orsolini and his passenger to walk on the interstate, the district court concluded that "a reasonable person would not have believed that he was free to go . . . ." But this conclusion is belied by the fact that Ferguson proceeded to drop Orsolini and his passenger off at a store and later stood by while they walked down the road away from the store. Although Orsolini and his passenger were eventually picked up and brought back to the scene of the traffic stop, that was only after the canine unit had alerted to drugs in the trunk of Orsolini's car.

Under all of these circumstances, there is no reason to believe that the officers did not diligently pursue their investigation or that the detention lasted any longer than was reasonably necessary to effectuate the purpose of the initial *Terry* stop. We therefore conclude that the district court erred in holding that Orsolini was detained for an unreasonable length of time.

### D.  Checkpoint-type of seizure

Finally, the district court concluded that the traffic stop was part of an illegal checkpoint-type of seizure. Orsolini concedes, however, that the district court's conclusion on this point was in error and that probable cause existed for the initial traffic stop because he was speeding.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

of sale. The driver's license was in the name of Nicholas Panatelli. According to the bill of sale, the car had been purchased by "Nicolas" Panatelli for cash in El Paso, Texas on June 26, 2000. Instead of a license plate, the car carried a temporary tag.

Pierce then asked Orsolini where he and his passenger were going. Orsolini said that they were traveling from California to Boston to see family. As he was speaking with Orsolini, Pierce observed a food bag and several food wrappers on the floorboard of the car and a large pile of clothes and luggage on the backseat. Pierce thought it suspicious that the luggage was in the back seat rather than in the trunk. He also inferred that Orsolini and his passenger had been traveling without stopping to eat or change clothes. Based on these observations and the fact that the bill of sale was from El Paso, Texas, which Pierce knew to be a common point of entry for illegal drugs, Pierce suspected that Orsolini and his passenger were engaged in drug trafficking. As a result, when Pierce returned to his patrol car to write up a citation for speeding, he called fellow Highway Patrol Officer Shannon Brinkley for assistance.

Brinkley arrived on the scene of the traffic stop approximately ten minutes later. After conversing with Pierce for two to three minutes, Brinkley proceeded to question Orsolini and his passenger. Orsolini told Brinkley that they were traveling from Texas to Boston to visit high school friends. He said that he had flown from California to Arlington, Texas to visit a friend of his grandmother. Later, Orsolini told Brinkley that his grandmother lived in Arlington and that her friend lived in El Paso, where he purchased the car. Orsolini also told Brinkley that he was unemployed and that the car he was driving was new when he bought it. The passenger separately related to Brinkley that they were traveling from Texas to Boston to visit Orsolini's family.

Pierce then issued a citation to Orsolini for speeding and told him that he was free to leave. As Orsolini was preparing to drive away, however, Brinkley asked Orsolini if he had

anything illegal in the car and if he would permit the officers to conduct a search. According to Pierce, Orsolini became visibly nervous at this point. His left eye began twitching, his breathing became more rapid, and the artery in his neck started bulging. Orsolini did, however, initially consent to the search. But after Pierce asked Orsolini to stand at the side of the road and to remove his hands from his pockets, Orsolini withdrew his consent. The officers then told Orsolini and his passenger that they were free to go, but that the car was going to be held until a canine unit arrived on the scene.

Pierce called for the canine unit at 3:27 p.m. At that time, Orsolini and his passenger stated that they wanted to go to the next highway exit to use the restroom and get something to drink. The passenger said that she would walk, but Brinkley informed her that pedestrians were not allowed on the interstate. Highway Patrol Officer Ferguson was then called to the scene for the purpose of driving Orsolini and his passenger to a store near the next highway exit. Ferguson arrived at 3:47 p.m. and drove them to the requested location. He later stood by while the two suspects walked down the road away from the store.

At 4:02 p.m., Highway Patrol Officer Williams arrived with a drug-sniffing dog. After the dog detected the presence of drugs in the car, the officers opened a door and allowed the dog to enter. The dog's alert indicated that there were drugs in the trunk. At this point, the officers on the scene radioed Ferguson and requested that he bring Orsolini and the passenger back to the car. The two were arrested after marijuana was found in the car's trunk.

## B.  Procedural background

In August of 2000, Orsolini was charged with possession with intent to distribute marijuana and with conspiring to commit the same crime, in violation of 21 U.S.C. §§ 841(a)(1) and 846. He filed a pretrial motion to suppress the evidence resulting from the above-described traffic stop, asserting that the marijuana that was discovered should be excluded as the "fruit" of an illegal search. After holding an

But the government asserts that Orsolini was not detained, because the officers told him that he was free to leave and because he was in fact given a ride to the nearest exit. In the alternative, the government contends that even if he was detained, "the nature of the detention was not unreasonable under the circumstances."

The Constitution protects individuals and their possessions from unreasonable seizures. *United States v. Avery*, 137 F.3d 343, 348 (6th Cir. 1997). "A seizure, within the meaning of the fourth amendment, occurs only when a reasonable person, in view of the circumstances surrounding the encounter with law enforcement officials, believes he is not free to leave." *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). "Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances." *Avery*, 137 F.3d at 349. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). There is, however, "no rigid time limitation on the lawfulness of a *Terry* stop." *Winfrey*, 915 F.2d at 217. A court should instead "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant . . . ." *United States v. Sharpe*, 470 U.S. 675, 687 (1985).

Contrary to the district court's conclusion, we are of the opinion that Orsolini was not detained for an unreasonable length of time. The traffic stop began at 3:11 p.m. By 4:02 p.m., the canine unit had arrived on the scene and alerted the officers to the presence of illegal drugs. The entire investigation thus lasted for less than one hour. Of that time, approximately 35 minutes were spent waiting for a canine unit to arrive. This is not an unreasonable amount of time, particularly given that much of the delay occurred because the canine unit was off-duty. Moreover, at 3:27 p.m., the officers

U.S. 266, ---, 122 S. Ct. 744, 752 (2002) (holding that the following circumstances supported a finding that a border patrol agent had a reasonable suspicion to believe that Arvizu was engaged in illegal activity: (1) Arvizu slowed his vehicle down when he saw the agent, (2) Arvizu failed to acknowledge the agent, (3) the knees of the children in the car were in a raised position, (4) the children in the car waved to the agent in an unusual manner, (5) the little-used road Arvizu was driving on was commonly used by smugglers, (6) Arvizu approached the area at approximately the same time that agents changed shifts, and (7) minivans are often used by smugglers).

This is admittedly a close case. But in comparing the factual inferences drawn by Officers Pierce and Brinkley with those that the Supreme Court held justified the stop in *Arvizu*, we are of the opinion that the circumstances here provide—both qualitatively and quantitatively—even stronger support for a finding that the officers had "a reasonable suspicion of criminal activity." *Palomino*, 100 F.3d at 449. By failing to consider the totality of the circumstances, the district court erred in holding that the officers' suspicion was unreasonable.

### C. Reasonable detention

The district court also concluded that Orsolini and his passenger were "detained for an unreasonable amount of time without probable cause." This conclusion was based in part upon the fact that the officers would not allow Orsolini and his passenger to walk on the interstate highway to the nearest exit. They thus had to either walk through the woods or ride in a patrol car. The district court concluded that "under these circumstances, [] a reasonable person would not have believed that he was free to go and that Orsolini was detained." After reaching this conclusion, the district court held that "the detention of [Orsolini] was an unlawful seizure and the contraband discovered during the ensuing search shall be excluded."

evidentiary hearing, the district court granted Orsolini's motion. This timely interlocutory appeal by the government followed.

## II. ANALYSIS

### A. Standard of review

When reviewing a motion to suppress evidence, we will set aside the factual findings of the district court only if we conclude that they are clearly erroneous. Conclusions of law, however, are reviewed de novo. *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir. 1993).

### B. Reasonable suspicion

The district court listed the following circumstances as the bases for the officers' suspicion that Orsolini was involved in criminal activity:

(1) the recent purchase of the vehicle with cash in a source city for drugs;
(2) inconsistent stories about where and why Orsolini had been in Texas;
(3) inconsistent stories from Orsolini and [his] passenger about who[m] they were going to see in Boston;
(4) inconsistent stories as to the nature of the relationship between Orsolini and the passenger;
(5) [Orsolini] became visibly nervous when he was asked for consent to search the vehicle; and
(6) Orsolini's subsequent revocation of his consent.

After deciding that none of these individual circumstances created a reasonable basis for the officers' suspicion that Orsolini was involved in criminal activity, the district court concluded that "in light of the circumstances, the officers' suspicion was neither reasonable nor articulable."

On appeal, the government claims that, contrary to established law, the district court considered each of the above-listed suspicious circumstances individually rather than

examining the totality of the circumstances. The government also contends that the district court failed to consider several other relevant circumstances that led to the officers' suspicion that Orsolini was involved in criminal activity.

"A traffic stop is analogous to a '*Terry* stop' in that, following the initial stop, the subsequent detention cannot be excessively intrusive and must be reasonably related in time to the investigation." *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999). In analyzing the reasonableness of any subsequent detention, a court must consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968). A temporary detention for questioning "is justified by specific and articulable facts that give rise to a reasonable suspicion of criminal activity." *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996) (citing *Terry*, 392 U.S. at 21). In determining whether reasonable suspicion was present, a court must consider the totality of the circumstances. *Id*. This court has held that "reasonable suspicion can be based on a totality of circumstances[,] no one of which standing alone would create a reasonable suspicion." *United States v. Anderson*, 923 F.2d 450, 455 (6th Cir. 1991).

As noted above, the district court found that the officers' suspicion was premised on the six circumstances listed above. But the district court erred by analyzing each of these circumstances individually, rather than basing its decision on their totality. For example, the district court concluded that "[t]he recent cash-purchase of a vehicle does not yield to an assumption of criminal activity." The district court also held that the inconsistencies in Orsolini's and his passenger's accounts as to the nature of their relationship, why they had been in Texas, and why they were going to Boston "fail to establish an articulable and reasonable suspicion of criminal activity." Finally, the district court determined that Orsolini's revocation of his initial consent to a search of his car was not a sufficient basis for a reasonable, articulable suspicion.

The district court ostensibly considered the combined impact of several of the above circumstances at only one point during its analysis. After noting that this court has held that "nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself," *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995), the district court concluded that "the nervousness of Orsolini alone *and in conjunction with the other cited factors*, cannot serve as a basis for a reasonable, articulable suspicion of criminal activity." (Emphasis added.) The district court, however, then proceeded to consider in isolation the relevance of Orsolini's revocation of his consent to a search. Given that the district court analyzed the relevant circumstances individually, its conclusory statement that it considered Orsolini's nervousness "in conjunction with the other cited factors" is insufficient to establish that it properly considered the totality of the circumstances in deciding that the officers' suspicion was not reasonable.

The district court also erred by not taking into account all of the relevant circumstances. In particular, the district court failed to consider three additional factors: (1) Orsolini's only proof of identity was a photocopy of an interim driver's license issued by the state of California, (2) Officer Pierce thought it suspicious that Orsolini and his passenger had their luggage on the back seat of the car as opposed to in the trunk, and (3) based on his observation of a food bag and several food wrappers on the floorboard of the car and a large pile of clothes on the backseat, Pierce inferred that Orsolini and his passenger had been traveling without stopping to eat or change clothes.

None of these individual circumstances is sufficient by itself to create a reasonable suspicion of criminal activity, but when combined with the six factors that the district court did consider, we believe that they are sufficient to support a reasonable suspicion. The Supreme Court has recently reiterated that "factual inferences drawn by the law enforcement officer" must be given "due weight" in analyzing the totality of the circumstances. *United States v. Arvizu*, 534