UNITED STATES of America, Plaintiff,

v.

Nilsson BORRERO, Defendant.

Crim. No. 90–CR–80502.

United States District Court,
E.D. Michigan, S.D.

July 3, 1991.

Michael Buckley, U.S.Atty., Detroit, Mich., for plaintiff.

Juan Mateo, Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT BORRERO'S MOTION TO SUPPRESS EVIDENCE

ROSEN, District Judge.

### I. INTRODUCTION

Defendant Nilsson Borrero is charged, along with his co-Defendant, Richard Loero, with two counts of drug possession, aiding and abetting and conspiracy with intent to distribute cocaine arising out of a search at Detroit Metropolitan Airport on June 5, 1990, of luggage they were carrying after deplaning from a flight from Miami, Florida.[1]

Presently before the Court is Defendant Borrero's Motion to Suppress Evidence of the cocaine and other evidence found in the travel bag he was carrying upon execution of a search and seizure warrant on June 5, 1990.

The Court heard the testimony of several witnesses during proceedings conducted in open court on this matter on October 26, 1990, April 17, 1991 and May 3, 1991.[2]

---

1. The original June 14, 1990 Indictment charged Defendants Loero and Borrero with only two counts—conspiracy to possess cocaine with intent to distribute, and, possession and aiding and abetting the possession of cocaine with intent to distribute. On January 7, 1991 a Superseding Indictment was issued, adding to the drug possession charges two more charges for each of the Defendants' failure to appear before the Court as required, in violation of 18 U.S.C. § 3146(a)(1). The circumstances giving rise to Counts III and IV of the Superseding Indictment are discussed in note 2, *infra*.

2. Both Defendants Borrero and Loero had been released on bond pending trial, and the hearing on Defendant Borrero's suppression motion and Defendant Loero's separately filed Motion to Suppress was scheduled to commence on October 26, 1990. Defendant Borrero, however, failed to appear at the October 26th hearing, and his attorney was unsuccessful in his attempts to contact him that date. As a result of Borrero's failure to appear, on October 29, 1990 an Arrest Warrant was issued for his re-capture, and his bond was revoked. Borrero was subse-

During the three days of proceedings, the court heard the testimony of two Michigan State Police officers (Detective Lieutenant Gregory Sykes and Detective Sergeant Mario Burns),[3] United States Border Patrol Agent Edward Winn, and Defendant Nilsson Borrero, and also received into evidence several documents and other physical evidence.

## II. FINDINGS OF FACT

Based on the testimony and other evidence received by the Court during the three days of proceedings on this matter, the Court makes the following findings of fact.

On June 5, 1990, Detective Lieutenant Gregory Sykes (then a Detective Sergeant), Sergeant Mario Burns and Trooper Richard Haywood members of the Michigan State Police Narcotics Unit Detroit Metropolitan Airport Drug Task Force (referred to herein as the "agents"), were monitoring arriving Northwest Airlines flights at Detroit Metropolitan Airport for suspected drug couriers. As of June 5, 1990, Agent Sykes, who has been a law enforcement officer for 12½ years, had been a member of the Airport Drug Task Force for approximately 18 months. Sykes testified that during those 18 months on the Drug Task Force, he had been involved in numerous drug interdiction investigations, which investigations included surveillance activities, police-citizen contacts, and arrests. Sykes further testified that he had been trained, along with other drug enforcement task force agents, on "drug profile" identifications. On June 5, 1990, Agent Sykes was training Agents Burns and Haywood in the identification, surveillance and investigation of individuals suspected of carrying illegal drugs.

## A. THE AGENTS' OBSERVATION AND SURVEILLANCE OF LOERO AND BORRERO UPON DEPLANING AND THROUGH THE TERMINAL TO THE TAXI STAND

At approximately 3:00 p.m. on June 5, 1990, while monitoring the deplaning of passengers from Northwest flight 996 from Miami, Florida (a known source city for drugs), at Gate 9 of Concourse D at the Detroit airport,[4] the agents observed Defendant Richard Loero looking nervously around the gate area as he deplaned. Loero was one of the first passengers to deplane. He was wearing sunglasses and

---

quently apprehended in New Mexico and brought before the federal court in that State. The United States District Court for New Mexico ordered Borrero detained and transported back to the Eastern District of Michigan on December 3, 1990. He appeared before this Court on December 13, 1990 and ordered detained pending trial.

Meanwhile, Defendant Loero appeared at the October 26, 1990 hearing, and therefore, the Court began hearing evidence on Loero's suppression motion that date. (The hearing on Loero's motion, however, was not completed on October 26th and was scheduled to be continued on October 29, 1990. However, Loero—like his co-defendant did on October 26th—failed to appear for the continued October 29, 1990 hearing, and, therefore, his bond was also revoked and an Warrant for his arrest and detention was also issued. To date, Defendant Loero has not surrendered or been apprehended.)

Loero's Motion to Suppress involved the same parties and events called into question by Defendant Borrero's Motion. Borrero's attorney was present during the October 26, 1990 proceedings, during which proceedings some of the same witnesses who testified in Court in connection with Defendant Borrero's suppression Motion on April 17 and May 3, 1991 also testified. Therefore, the Court permitted Borrero's attorney to cross-examine witnesses at the April 17 and May 3, 1991 proceedings based on their testimony given on October 26th, as well as on their April 17th and May 3rd testimony during the Government's direct examination.

Because of Defendant Loero's continued absence, this Memorandum Opinion and Order addresses only Defendant Borrero's Motion to Suppress. Defendant Loero's suppression motion will be held in abeyance and further hearing on his motion will be held after Loero surrenders or is apprehended.

3. A third Michigan State Police officer, Trooper Richard Haywood, was also involved in the events of June 5, 1990. Although Trooper Haywood was also present and available to testify, Defendant Borrero, through his attorney, stipulated to waive production of Haywood after Lt. Sykes and Sgt. Burns testified.

4. The Court notes that, in accordance with the Court's October 26, 1990 request, counsel for the parties, contacted Northwest Airlines, and Northwest verified that flight 996 from Miami arrived in Detroit at 3:00 p.m. on June 5, 1990.

was carrying only a small old, worn brown leather gym-type bag with shoulder straps.

Loero left the gate area and proceeded toward the baggage claim area. The agents observed Loero looking back over his shoulder as he walked toward the baggage claim area as if he was trying to detect whether he was being followed. Sykes nodded to Agents Burns and Haywood, who were standing on the opposite side of the gate area, to follow Defendant Loero. Sykes remained in the gate area to observe the remaining deplaning passengers.

Sykes then observed Defendant Nilsson Borrero deplane flight 996 behind Loero. Borrero also looked nervously around the gate area while deplaning. Borrero was carrying a small brown nylon gym-type bag as he exited the plane. After Borrero left the immediate gate area, Sykes then proceeded down the concourse to catch up with Agents Burns and Haywood, walking behind Defendant Borrero.

Like Defendant Loero, Borrero also proceeded toward the baggage claim area, staying approximately 50 yards behind Loero. Borrero, too, kept looking back over his shoulder while walking as if trying to see if he was being followed. Defendant Loero stopped in the men's restroom in the middle of the concourse. Agent Haywood followed Loero into the men's room, and exited the men's room behind him.

After Loero left the men's room, he continued to proceed down the concourse toward the baggage area. At some point near concourse "E", Loero and Borrero were observed making contact. After engaging in a brief conversation, the two men walked together toward the baggage claim area. Loero separated from Borrero about 20 feet before reaching the revolving doors leading to the baggage pick-up area. Loero stopped and waited until Borrero proceeded ahead to the revolving door. Borrero continued walking through the revolving door to the baggage pick-up area. Loero then went on through the revolving door himself.

Borrero walked to a pay phone, made a telephone call, and appeared to have a phone conversation with someone. Loero approached and spoke with Borrero for several minutes while Borrero had the phone in his hand (and appeared to still be talking to someone on the other end). Borrero finally hung-up the telephone, and he and Loero walked together toward the exit of the terminal, without picking up any luggage.[5] Borrero exited the terminal first and got into a taxi cab. Loero waited a few moments, then exited the terminal through the same doors behind Borrero.

Upon exiting the terminal, the agents observed Borrero get into the back seat of a taxi cab, shut the cab door, and roll down the rear passenger-side window. Upon exiting the terminal himself, Mr. Loero walked toward the cab. Before Loero got to the cab, Agents Sykes and Haywood approached him. Agent Burns walked ahead to the cab into which Mr. Borrero had entered. Agent Sykes testified that it took approximately 7 minutes from the time that Loero and Borrero deplaned until the time when the agents made contact with the Defendants at the taxi stand, and neither Defendant Borrero nor any of the other witnesses having testified otherwise, the Court credits Agent Sykes' testimony on this issue.

## B. THE AGENTS' CONTACT WITH LOERO AND BORRERO AT THE TAXI STAND

Upon approaching Defendant Loero about 10 feet away from the taxi cab that Borrero had already entered, Agents Sykes and Haywood identified themselves to Loero and showed him their badges and picture identification. Agent Burns proceeded to make contact with Mr. Borrero by speaking to him through the open passenger-side rear window of the cab. Both Agents Sykes and Burns testified that all three of the agents—Sykes, Burns and

---

**5.** Agent Sykes testified that Loero and Borrero had passed two exits they each could have used to exit the airport if they were not picking up checked baggage, rather than exiting the terminal through the baggage claim area.

Haywood—were dressed in plain casual clothing, and none of them ever displayed their weapons; Agent Sykes testified that his gun was strapped to one of his ankles and covered by the leg of his trousers, and Agent Burns testified that his weapon was in his waistband, covered by his polo shirt. Both Agent Sykes and Agent Burns further testified that at no time did any of the agents physically touch or place their hands on either of the Defendants. Defendant Borrero did not dispute these facts, therefore, the Court credits the agents' testimony on these issues.

Agent Sykes asked Mr. Loero if he and Agent Haywood could speak with him for a few minutes. Loero agreed and put his leather bag down on the ground. Sykes asked if he could see Loero's airline ticket and Loero handed his ticket to Sykes. Sykes did not in any way suggest that if Loero did not produce his ticket he would not be free to leave.

Upon reviewing Loero's ticket, Sykes noted that Loero had arrived on the inbound June 5th 3:00 p.m. Miami flight, and that Loero's ticket was for a "round trip", the return flight to Miami departing at 5:50 p.m. that same day. Sykes further noted that the name on the ticket was "R. Garcia" and the ticket indicated that it had been purchased that same day (June 5, 1990) and paid for in cash.

Sykes testified that his review of Loero's ticket—which established that Loero only intended to stay in the Detroit area for less than 3 hours (i.e., less than the amount of time it took to fly from Miami)—coupled with his observations of Loero's conduct and behavior in the terminal, increased his suspicions that "something unusual was going on." He, therefore, asked Loero if he had any picture identification. Loero said he did not. Sykes testified that he

handed Loero's ticket back to him, and advised Loero that he and Haywood were drug agents, that they routinely contacted citizens passing through the Detroit airport in connection with their drug interdiction investigation duties, and asked if he would cooperate with their investigation. Loero agreed.

Agent Burns, meanwhile, had approached the taxi cab that Defendant Borrero had entered. He observed that when he approached the cab, the brown nylon bag that Borrero had been carrying was on the seat right next to him. Agent Burns showed Mr. Borrero his badge and picture identification and told Borrero—in English—that he worked at the airport, and asked if he wouldn't mind talking to him for a few minutes. At this point, Borrero pushed the brown nylon bag away from him toward the driver's-side of the rear passenger seat, nodded his assent to Burns' request, and got out of the cab, leaving his bag in the cab and shutting the cab door behind him after he got out. Agent Burns testified that when Borrero got out of the cab, he was breathing heavily and had begun to perspire profusely.[6]

Agent Burns testified that after Defendant Borrero got out of the cab, the cab driver reached over the front seat, took Borrero's bag and tossed it out the front passenger-side window. The bag landed on the ground but Borrero made no effort to pick up the bag or move toward it.[7] Right after the cab driver tossed Borrero's bag out of the cab, the cabbie drove off.

Burns did not tell Mr. Borrero that he was not free to hail another cab and leave. Rather, he asked Borrero—again in English—if he could see his airline ticket. Mr. Borrero complied with Burns' request, produced his airline ticket and handed it to

---

**6.** Although Borrero testified that Agent Burns asked him to get out of the cab, having heard all of Agent Burns' and Defendant Borrero's testimony, and having had occasion to observe their demeanor, the Court credits Agent Burns' version of what he asked of Borrero and finds that Agent Burns did *not* ask Borrero to get out of the cab.

**7.** Although Borrero contends that the cab driver called to him and personally "handed" him his bag through the window, Agent Sykes—who testified that he observed Agent Burns' contact with Borrero from barely 10 feet away—corroborated Agent Burns' version of the cab driver tossing Borrero's bag out the window and Borrero's failure to pick the bag up at this point. For this reason, the Court credits Agents Burns' and Sykes' testimony on this issue.

Agent Burns. At this point, Agent Sykes walked over to Agent Burns and Defendant Borrero, and Burns handed Borrero's ticket to Sykes.

Sykes reviewed Borrero's ticket and noted that Borrero's and Loero's tickets were numbered consecutively, that Borrero's ticket bore the name "W. Guttieriez", showed the identical arrival and departure dates and times as Loero's ticket, and also showed that Borrero's ticket, like Loero's, had been purchased that same day and paid for in cash. Sykes then asked Borrero—in English—for picture identification and Borrero complied with Sykes' request by handing him a West Virginia drivers' license bearing the name "Nilsson Borrero" with his picture on it.

By this time, Loero and Borrero were standing together with Agents Sykes, Burns and Haywood. Sykes asked Loero whether he knew Borrero, and Loero said that he did not; that they had just met on the plane. He asked Loero what his purpose was for visiting the Detroit area and Loero answered that he was an interior decorator and was in Detroit to look at some jobs. Sykes then asked Borrero what his purpose was for visiting Detroit. Borrero did not respond and Defendant Loero told the agents at this point that Borrero did not understand English very well.

Sykes asked whether the two men were in a hurry and Loero said they were not. He then asked the two Defendants if they would agree to a search of their persons and their bags. Loero verbally consented to such a search. Sykes then asked whether Loero was willing to accompany the agents to the DEA office inside the terminal. Loero agreed. Sykes then asked Loe-ro—who, according to both Agents Sykes and Burns spoke English quite well—to translate and relay his request to Borrero in Spanish.[8] Sykes testified that Loero then spoke to Borrero in Spanish (although not being able to understand Spanish he does not know what Loero said to Borrero). Borrero said nothing to the agents in response but picked up his bag and went with Loero and the three agents back into the terminal. The entire exchange between the agents and the Defendants at the taxi stand took approximately 7 minutes.

The group proceeded through the terminal to the DEA office, with each of the two Defendants carrying the bags with which they had respectively deplaned. It took approximately another 12 minutes for the group to get to the DEA office. At no time did the agents tell either of the Defendants that they were under arrest or not free to leave, nor did the agents brandish their weapons or ever place their hands on either of the Defendants or their bags.

## C. THE QUESTIONING OF DEFENDANT BORRERO IN THE DEA OFFICE

Upon arriving at the DEA office—at approximately 3:30 p.m.—Loero and Borrero were offered seats. They sat down and placed their bags at their feet. Sykes then briefed Spanish-speaking U.S. Border Patrol Agent Edward Winn[9] regarding what had transpired and explained what he wanted Winn to translate for Loero and Borrero.

Loero and Borrero were subsequently introduced to Agent Winn. Sykes asked Winn to explain to Loero and Borrero in Spanish what their purpose was and what

---

**8.** Sykes also testified that he radioed the DEA office to see if a Spanish-speaking agent was available to translate for him, and when he was told that there was one available, he informed the office of their location.

**9.** Winn testified that he was in the DEA office when Sykes radioed for a Spanish interpreter and that he left the DEA office immediately to head for the baggage area taxi stand. He proceeded to the taxi stand via the sidewalk outside the terminal because he believed that that was the shortest and quickest way to get there.

However, when he got to the taxi stand, the agents and the Defendants had already left for the DEA office via an inside-the-terminal route. Unable to locate the group, Winn radioed Agent Sykes for his position and Sykes informed Winn that they were enroute to the DEA office. Therefore, Winn proceeded to return to the office to meet up with the group there by "jogging" the same exterior route he had taken to get to the taxi stand. He arrived at the office a few minutes before the group arrived.

Agent Sykes requests of Loero and Borrero were. Winn testified that Sykes would say what he wanted Winn to say in English, and that Winn translated what Sykes had said into Spanish sentence by sentence.

After explaining the purpose of the Drug Task Force, Winn testified that he first questioned Defendant Borrero. He asked Borrero whether the nylon bag he had been carrying was his. Borrero said that it was not his bag. When asked whether anything inside the bag belonged to him, Borrero said that nothing in the bag was his. Winn then asked Borrero where he got the bag and Borrero told Winn that he found the bag on the airplane.[10] After Winn translated into English and relayed Borrero's answers to Agent Sykes, Sykes told Winn that they would "go with a K-9 alert, if we can, on the bag."[11]

Winn testified that at this point, he directed his attention to Defendant Loero. Winn testified that Loero admitted that the bag he was carrying was his, and that Loero consented to a search of his bag, both orally and in writing. Agent Winn testified that he reviewed the consent form with Loero, in both English and Spanish, before Loero signed it. Loero said that he understood what the consent form said,

and after reading it himself, signed the form using the name "Richard Garcia". Agents Winn and Sykes also signed Loero's consent form, noting the time of their signatures as witnesses to Loero's signing as "16:40", or 4:40 p.m.[12]

Upon obtaining Loero's written consent, Loero and Borrero were moved into separate rooms, where, although the two were still in view of each other, Borrero could not see what was going on with respect to the search of Loero's bag. Agent Sykes then opened Loero's bag and found two plastic-wrapped one-kilo bricks of cocaine,[13] the street value of which Agent Sykes testified was approximately $560,000. After finding the two kilos of cocaine in Loero's bag, Loero was placed under arrest for a controlled substance violation.[14]

The Court finds that the total amount of time that had lapsed from the time that Loero and Borrero arrived in the DEA office until Loero consented to the search of his bag (the search of which turned up two kilos of cocaine) was approximately one hour and 10–15 minutes.

Sykes then began drafting an affidavit to obtain a search warrant to open and search the bag Borrero had been carrying.[15] Sykes testified that he had had no training

10. At the May 3, 1991 hearing, Defendant Borrero admitted that he, in fact, denied ownership of the bag and its contents when questioned by Agent Winn and admitted that he told Winn that he found the bag on the airplane.

11. Sykes arranged for a drug canine sniff of the bag which required arranging to have the bag moved to the unclaimed baggage area for an "unbiased" sniff, and arranging for a canine handler and a drug-trained dog to be brought to the baggage area to sniff the bag.

12. The Court credits the "16:40" military time noted by Agents Sykes and Winn on Loero's consent form as accurately reflecting 4:40 p.m. (civilian time), and not that the agents intended to the time to reflect 3:40 p.m. because both Agents Sykes and Winn testified at the October 26, 1990 proceedings that they had looked at their watches and/or the clock on the DEA office wall before noting the time beneath their signatures, and both testified on that date that they were familiar with military time notations. The Court specifically discredits Winn's and Sykes' subsequent April 17 and May 3, 1991 testimony that they were both mistaken in their translation of civilian time to military time both

when they noted the time on the consent form on June 5, 1990 and when they testified on October 26th.

13. Sykes testified that he found two plastic-wrapped bricks of a white substance which were immediately field tested and the results positively showed that the substance was cocaine.

14. Agent Winn also testified that after Loero signed the consent to search form, he asked both Loero and Borrero—who admitted they were not U.S. citizens but claimed to be resident aliens—to see their alien registration "green" cards. Both Defendants stated that they did not have their green cards on them that day, and Winn testified that he placed them under arrest for failing to carry their alien registration cards.

15. The basis of Sykes' "probable cause" affidavit was the results of the drug detection canine's sniff of the brown nylon bag which Borrero claimed was not his. Drug detection K-9 Cora sniffed the bag after Borrero disclaimed ownership of it and gave a positive aggressive indication that the bag contained drugs.

in drafting affidavits, and that in his 12 years as a police officer, he had only drafted five or six affidavits. He testified that it took him an hour and 20 minutes to an hour and a half to complete the affidavit for the search warrant of Borrero's bag. When Sykes finished writing his affidavit, it was telefaxed to Detroit. It took approximately 15 to 20 minutes for the airport fax machine to transmit Sykes' five-page affidavit to Detroit for submission to a Magistrate Judge as probable cause for a search warrant.[16]

Upon being informed that the Magistrate Judge had issued a search and seizure warrant, the bag that Defendant Borrero had been carrying was opened and searched. In the bag, Sykes found three plastic-wrapped one-kilo bricks of cocaine (street value $840,000). An employment application with the name "Nilsson Borrero" was also found in the bag. After the cocaine was found in Borrero's bag, Borrero was placed under arrest.

Defendant Borrero now moves to suppress the evidence found in the brown nylon bag which he had been carrying by of which he disclaimed ownership on June 5, 1990. The gist of Defendant Borrero's suppression argument is that he was illegally seized and detained by law enforcement agents at Metro Airport on June 5, 1990 (the date on which the cocaine was found in his and Defendant Loero's bags) for an "unreasonable length of time". Further, Borrero contends that his illegal seizure and detention taints his denial of ownership of the bag. He argues that because he was illegally detained, the statements he made while he was detained denying ownership of the bag must be deemed to be involuntary and invalid. Therefore, Borrero contends that the search of his bag and the finding of the cocaine and other evidence in it—which events were precipitated by his denial of ownership of the bag—are "fruits of a poisonous tree", and, as such, admission of the evidence found in

the bag would violate the Fourth Amendment.

The Government counters that Borrero was *not* illegally seized or detained, but rather that all of the actions of the Drug Task Force agents on June 5, 1990 were constitutionally permissible. Therefore, they argue that Borrero's disclaimer of ownership was valid and voluntary, and by virtue of his disclaimer and Borrero lacks standing to raise a Fourth Amendment challenge to the search of, and evidence found in, his bag.

### III. LEGAL DISCUSSION

In the airport stop context, there are three legally distinct types of encounters that may occur between law enforcement officers and the traveling public. *United States v. Flowers*, 909 F.2d 145, 147 (6th Cir.1990); *United States v. Cooke*, 915 F.2d 250, 251 (6th Cir.1990).

The first is a contact initiated by a law enforcement officer without any articulable reason whatsoever. *United States v. Flowers, supra*, 909 F.2d at 147; *United States v. Cooke*, 915 F.2d at 251–252. This type of encounter is frequently referred to simply as a "police-citizen" contact or encounter. *United States v. Flowers, supra.*

The second type of encounter is that predicated upon a law enforcement officer's "reasonable articulable suspicion" of criminal activity. *Id.; United States v. Cooke, supra.* See also, *United States v. Winfrey*, 915 F.2d 212 (6th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Garcia*, 866 F.2d 147 (6th Cir.1989); *United States v. Knox*, 839 F.2d 285 (6th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). This type of encounter is what is referred to as a *"Terry*[17] stop." *United States v. Flowers, supra; United States v. Cooke, supra*, 915 F.2d at 252.

---

**16.** The fax transmittal time is indicated on two pages of Sykes' affidavit (Government Ex. 1)—page 4 bears the notation 17:28 (i.e., 5:28 p.m.) and page 5 bears the notation 17:43 (5:43 p.m.)

**17.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

The third category of encounters is when the law enforcement officers have "probable cause" to believe that a crime has been committed and that the person stopped or detained committed it. *United States v. Flowers, supra; United States v. Cooke, supra.*

In the context of airport police-citizen confrontations, it is not uncommon for the characteristics of *all three* of the above-described categories of encounters to exist and/or develop with reference to law enforcement officers' initial contact and subsequent detention of a single traveller. *See e.g., United States v. Flowers, supra; United States v. Winfrey, supra; United States v. Garcia, supra.*

The Court finds that this is one such case in which all three types of police-citizen confrontations are manifested. Thus, the Court must determine (1) the nature of the Drug Task Force agents' initial contact with Defendant Borrero; (2) whether that initial contact was permissible under the Fourth Amendment; (3) whether, and at what point that initial contact developed into the next phase/or phases of confrontation; and (4) whether the subsequent phases or phases of confrontation were also permissible under the Fourth Amendment.

## A. THE AGENTS' ENCOUNTER WITH DEFENDANT BORRERO AT THE TAXI STAND WAS A PERMISSIBLE "POLICE–CITIZEN CONTACT", NOT A FOURTH AMENDMENT "SEIZURE"

As a threshold question, it must be determined whether Agents Burns' and Sykes' initial contact and seven-minute questioning of Defendant Borrero at the taxicab stand constituted a "seizure" within the meaning of the Fourth Amendment. Only if Defendant Borrero was "seized", is he vested with any right to constitutional safeguards. *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980); *United States v. Knox, supra.*

In *United States v. Mendenhall, supra,* the Supreme Court held that a person has been "seized" within the meaning of the Fourth Amendment when

in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

446 U.S. at 554–555, 100 S.Ct. at 1877. [Citations omitted.] [18]

The Supreme Court recently reaffirmed its adherence to the *Mendenhall* test in *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), and in that case, made clear that what is meant by a "reasonable person" is a "reasonable *innocent* person". In *Bostick,* the Supreme Court rejected the defendant's argument that he must have been seized because no reasonable person would freely consent to questioning and a search of luggage he or she knows contains drugs, explaining,

This argument cannot prevail because the "reasonable person" test presupposes an innocent person. The fact that [respondent] knew the search was likely to turn up contraband is of course irrelevant; the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in [his] position.

*Id.* (citations omitted). *Accord, Michigan v. Chesternut,* 486 U.S. 567, 574, 108 S.Ct. 1975, 1979–80, 100 L.Ed.2d 565 (1988) ("This 'reasonable person' standard ... ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual.") *See also, United States v. Lewis,* 921 F.2d 1294, 1297 (D.C.Cir.1990) ("The reasonable

---

**18.** The Sixth Circuit has expressly adopted the *Mendenhall* standard as controlling law in this Circuit. *See, United States v. Tolbert, supra.*

person we posit is, of course, innocent of any crime." *Id.*)

■ In *Mendenhall*, the Supreme Court made clear that police officers constitutionally can, for any reason, approach a person and merely request to speak to the citizen.[19] *See also, Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983); *United States v. Winfrey, supra*, 915 F.2d at 216. Nor does a police officer's request for, and examination of an airline ticket and driver's license, or a request to accompany officers to another location amount to a "seizure" under the Fourth Amendment. *Florida v. Royer, supra*, 460 U.S. at 501, 103 S.Ct. at 1326; *United States v. Winfrey, supra; United States v. Collis*, 766 F.2d 219 (6th Cir. 1985), *cert. denied*, 474 U.S. 851, 106 S.Ct. 150, 88 L.Ed.2d 124 (1985).

As the Supreme Court explained in finding the police officers' initial contact with an airport traveller without any articulable reason whatsoever to have been permissible in *Florida v. Royer, supra,*

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification.

460 U.S. at 497, 103 S.Ct. at 1324 (citations omitted). *See also, United States v. Collis, supra* ("Absent coercive or intimidating

behavior which negates the reasonable belief that compliance is not compelled, [the agent's] questions for additional information from the defendant does not constitute a seizure under the Fourth Amendment." *Id.*, 766 F.2d at 221.)[20]

■ As explained above in this Memorandum Opinion and Order, all three of the agents—including Agents Burns and Sykes, who were the two agents who dealt with Defendant Borrero—were not in uniform; they were all dressed in plain casual clothing and none of them ever displayed their weapons. Agent Burns did not order or direct Defendant Borrero to get out of the taxicab—he did so voluntarily. Nor did any of the agents at any time physically touch or place their hands on either Defendant Borrero or Defendant Loero. Borrero was never "patted down" nor was his luggage searched at the taxi stand; rather he was only asked to produce his airline ticket and picture identification, both of which were immediately returned to him after Agent Sykes reviewed them.

Further, the agents did not order Borrero to come with them to the DEA office; they merely requested that he do so. And, although it appears that Borrero did not verbally assent or say anything to Agent Sykes in response to his request to accompany the agents to the office, Borrero did have a conversation in Spanish with his companion, co-Defendant Loero, after which conversation, Borrero did not move to leave, but rather picked up his bag and proceeded to follow Loero and the agents back into the terminal to the DEA office. During their walk to the office, the agents never physically touched Borrero or his belongings, nor did they brandish their weapons. Borrero was at all times free to separate from the group and go his own way.

**19.** *See also, Terry v. Ohio, supra,* ("There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets." 392 U.S. at 34, 88 S.Ct. at 1886 (White, J., concurring).)

**20.** *Contrast, United States v. Taylor,* 917 F.2d 1402, 1406 (6th Cir.1990), *vacated and reh. granted,* 925 F.2d 990 (6th Cir.1991), in which the Sixth Circuit found that a Fourth Amendment seizure had occurred at the point of the police officers' initial contact with the defendant after he exited the airport because, as the defendant exited the terminal, one of the officers—whose gun was visible—grabbed his arm, forced him back from the curb, shoved a police badge in his face and ordered him to stop.

By application of the above-cited authorities to these facts, the Court finds that from the time that Agent Burns first made contact with Defendant Borrero through the window of the taxicab until the time that Borrero, Loero and Agents Burns, Sykes and Haywood arrived at the DEA office inside the airport terminal, Defendant Borrero was not "seized" by the Drug Task Force agents.

## B. A TERRY–TYPE INVESTIGATORY DETENTION BEGAN ONCE BORRERO ARRIVED WITH THE AGENTS AT THE DEA OFFICE

■ Although in the interval between Agent Burns' initial contact with Defendant Borrero and the point in time at which Borrero arrived at the DEA office[21] there was no seizure, the Court finds that a "seizure" did occur once he arrived in the DEA office, because at that point, a reasonable person would not feel "at liberty to ignore the police presence and go about his business." *Michigan v. Chesternut, supra*, 486 U.S. at 569, 108 S.Ct. at 1976. The Court believes that even a "reasonable innocent person" would not feel free to leave a DEA office filled with law enforcement officers once within the confines of that office.

However, investigatory detentions rising to the level of a "seizure" are constitutionally permissible if supported by a "reasonable suspicion" that the person detained was engaged in wrongdoing. *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980); *Terry v. Ohio, supra; United States v. Knox, supra.* "Reasonable suspicion" is not the equivalent of "probable cause"; rather "reasonable suspicion" entails only "some minimal level of objective justification" for further investigation, which the Supreme Court has de-

fined as "something more than an inchoate and unparticularized suspicion or 'hunch', but less than the level of suspicion required for probable cause." *United States v. Sokolow, supra*, 109 S.Ct. at 1585.[22]

■ The precise question presented in *Sokolow*—which, like this case, involved the detention of an airline traveler whom law enforcement officers suspected of transporting contraband—was what constitutes a "reasonable articulable suspicion" such as to justify investigatory detentions of suspected drug couriers. The Court answered that question with the following discussion:

> In evaluating the validity of a stop such as this, *we must consider "the totality of the circumstances—the whole picture." United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). As we said in *Cortez:*
>
> > "The process [of determining what constitutes a reasonable suspicion] does not deal with hard certainties but with probabilities: Long before the law of probabilities was formulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact finders are permitted to do the same—and so are law enforcement officers." *Id.*, at 418, 101 S.Ct., at 695.

109 S.Ct. at 1585 (emphasis added).

In *Sokolow*, the Court examined the following facts: the defendant (1) was traveling under an alias; (2) took an evasive or erratic path through the airport; (3) paid $2,100 in cash for two airline tickets from a roll of $20 bills containing nearly twice that amount of cash; (4) travelled 20 hours from Honolulu, Hawaii to Miami, Florida (a known "source city" of drugs) in the month of July to spend only 48 hours in Miami. The *Sokolow* Court noted that while any

---

**21.** As explained *supra* in this Memorandum Opinion and Order, Borrero and Loero arrived at the DEA office about 25–30 minutes after they deplaned from the 3:00 p.m. June 5, 1990 Miami flight, and thus, their arrival at the DEA office appears to have occurred at approximately 3:30 p.m.

**22.** On the other hand, "probable cause" means "a fair probability that contraband or evidence of a crime will be found." *United States v. Sokolow, supra, quoting, Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). *See also, United States v. Grant*, 920 F.2d 376, 385 (6th Cir.1990).

one of these facts standing alone would not be proof of illegal conduct and would be quite consistent with innocent travel, "we think taken together they amount to reasonable suspicion." *Id.* 109 S.Ct. at 1586.[23]

In this case, the agents testified that they observed Defendants Borrero and Loero deplane flight 996 from Miami, Florida, a known source city for drugs. They observed both Defendants look nervously around the gate area as they deplaned. The Defendants pretended not to be travelling together. While walking through the airport, both Loero and Borrero kept looking back over their shoulders as if trying to see whether they were being followed. They also made a brief telephone call together, even though they had intended to appear as if they were not travelling together. Although they had obviously travelled a long distance, neither Defendant stopped to retrieve any checked baggage.

Further, when Agent Burns showed his ID to Borrero at the taxi stand, Borrero began to breathe heavily and perspire profusely. After talking with the Defendants at the taxi stand, and after examining their airline tickets, the agents further learned (1) that Defendant Borrero was traveling under an alias, (2) that, although Loero—who said he not have any identification on him—claimed to have just met Borrero on the plane from Miami, both he and Borrero had round-trip tickets numbered consecutively, purchased on the same date as the date on which they were traveling (June 5, 1990), (3) their tickets were paid for in cash, (4) their tickets revealed that they both were scheduled for a return flight from Detroit to Miami less than 3 hours later on that same date.

Based on the "totality of the circumstances—the whole picture"—the Court finds that, after talking to the Defendants and reviewing their tickets and ID at the taxi stand, the agents had a "reasonable articulable suspicion" to justify detaining both Defendants Borrero and Loero for further investigation to verify or dispel their suspicions.

## C. THE LENGTH OF TIME OF BORRERO'S "INVESTIGATORY DETENTION"

■ The Supreme Court has directed that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325. However, in *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), in which the Supreme Court held that a 20–minute detention of the defendant was not unreasonable, the Court explicitly refused to establish a *per se* rule as to the permissible duration of an investigatory stop. Rather, the *Sharpe* court set forth the following directive to trial courts:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.... A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation and in such cases the Court should not indulge in unrealistic second guessing.... A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objective of the policy might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable...." The question is not whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or pursue it.

109 S.Ct. at 1581, text plus n. 6.

---

**23.** The *Sokolow* Court further noted that these factors are aspects of the "drug courier profile".

470 U.S. at 686–687, 105 S.Ct. at 1575–76. *See also, United States v. Winfrey, supra* ("There is no rigid time limitation on the lawfulness of a *Terry* stop." 915 F.2d at 217.)

In *United States v. Winfrey, supra,* the Sixth Circuit formulated the following test:

> In testing whether the temporary detention of Winfrey ... was a justifiable *Terry* stop in the first place and, if so, lasted too long to fit the principle of the *Terry* rule, we triangulate 1) the evolving fourth amendment *Terry* rationale; 2) *all* the circumstances as they occurred at the confrontation scene; and 3) the judgment of the sheriff deputies ... about what was occurring before them.

> We are, of course, denied the benefit of considering the fact that ... lawyers, schooled in the necessities of fourth amendment law, assessing the circumstances abstractly long after the event, might or might not have handled the situation differently.

915 F.2d at 217 (emphasis in original).

By application of the *Sharpe* rule, in *United States v. Knox, supra,* the Sixth Circuit found the detention of the defendants for questioning in separate rooms in the airport security office for approximately a half an hour was not unreasonable under the circumstances. There, the court found that the length of the defendants' detention was at least in part due to the defendants' initial insistence that they did not know each other, despite the fact that they were walking together at the time they were first approached by the DEA agent. The court also found that it was reasonable to have the defendants accompany the DEA agent to the airport security office to effectuate a sniff search by a drug-trained dog as soon as they consented to a search.

In *United States v. Winfrey, supra,* the court found that the detention of the defendant for 45 minutes by Wayne County Sheriffs was reasonable under the circumstances because the Sheriffs were not trained drug agents and the length of time was necessary to allow trained DEA agents to get to the defendant's car in the parking lot [where the sheriffs were detaining the defendant] to question the defendant and inspect the car that the sheriffs suspected were involved in drug trafficking.

In *Jackson v. Wren,* 893 F.2d 1334 (table) (6th Cir.1990) (unpublished opinion), the Court, held that a drug courier defendant's detention in the sheriff's field office for *over two hours* to await the arrival of a DEA canine handler and drug detecting dog was not unreasonable, and did not violate the defendant's Fourth Amendment rights.[24]

As explained above, it appears from the testimony and evidence presented to the Court during the three-days of proceedings

---

**24.** The issue of the reasonableness of the length of time of "pre-probable cause determination" detention was recently addressed in *County of Riverside v. McLaughlin,* —— U.S. ——, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). *McLaughlin* was a habeas corpus action in which the respondent, who had been arrested without a warrant, challenged the length of time that he was detained in the county jail before a determination of "probable cause" was made. In that case, the Supreme Court approved a "pre-probable cause determination" detention of *48 hours.* Although *McLaughlin* does not involve the same factual setting or precise legal issues involved in the present case, that decision provides further guidance for evaluating the reasonableness of the length of Defendant Borrero's detention before the agents' suspicions rose to the level of "probable cause".

With respect to the reasonableness of the 48–hour length of pre-probable cause determination detention, the *McLaughlin* Court explained,

> [A] particular case [may not pass] constitutional muster ... if the arrested individual can prove that his or her probable case determination was delayed unreasonably. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. *In evaluating whether the delay in a particular case is unreasonable, however, courts must allow a substantial degree of flexibility. Courts cannot ignore the often unavoidable delays* in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy processing other suspects or securing the premises of an arrest, *and other practical realities.*

111 S.Ct. at 1670 (emphasis added).

on this matter that approximately one hour and 10 minutes lapsed from the time when the Defendants arrived in the DEA office until the time that Defendant Loero's bag was searched pursuant to his signed consent, which search revealed two kilos of cocaine in the leather bag he had been carrying.

At this point, it can be said with little doubt that the agents' "reasonable suspicion" of Defendant Borrero (and the bag he was carrying) was elevated to the level of "probable cause". The unrebutted testimony of Border Patrol Agent Edward Winn was that during the time before Defendant Loero's bag was searched, he was briefed by Agent Sykes regarding what had transpired earlier in the day and what Sykes wanted him to do in connection with the investigation of Loero and Borrero.

Winn testified that after he was briefed by Sykes, he translated Sykes' explanation of the Drug Task Force's function into Spanish for Loero and Borrero, sentence by sentence as Sykes told him what to say. Agent Winn further testified that he translated Sykes' questions—question by question—from English to Spanish for Borrero, and then translated Borrero's responses— sentence by sentence—from Spanish into English, and relayed those responses to Sykes.

Given the "practical realities" of the translation process, and by application of the authorities cited *supra*, the Court finds that the fact that Borrero was subject to a "no probable cause investigatory detention" for 70 minutes before the search of Loero's bag elevated his detention to one supported by "probable cause", does not amount to such unreasonableness to render his detention unconstitutional, and Borrero has not offered any other arguments to support an unreasonableness proposition.

Moreover, Agent Winn's undisputed testimony was that he questioned Borrero *before* he turned his attention to Loero and the consent to search form, and it was during his questioning of Borrero that Borrero disclaimed ownership of the bag he had been carrying. As a result of Borrero's denial of ownership of the bag, a ca-

nine drug sniff had to be arranged. The Supreme Court and the Sixth Circuit have expressly sanctioned detentions for the purpose of proceeding with a drug-trained canine sniff. *See, United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *United States v. Knox, supra; Jackson v. Wren, supra.*

After the drug-trained dog positively reacted to the presence of contraband in the bag Borrero had been carrying, the agents' "reasonable suspicion" of Borrero's criminal activity was elevated to "probable cause." Agent Sykes proceeded to draft a probable cause affidavit to obtain a warrant to search the bag. The Supreme Court has repeatedly interpreted the Fourth Amendment as permitting a seizure pending issuance of a warrant to examine contents of containers which law enforcement authorities have probable cause to believe hold contraband or evidence of a crime. *See, United States v. Place, supra*, 462 U.S. at 701, 103 S.Ct. at 2641 and cases cited therein.

By application of the foregoing authorities to the facts of this case, the Court finds that Borrero's detention in the DEA office was constitutionally permissible.

D. HAVING DISCLAIMED OWNER-SHIP IN THE BAG HE WAS CARRYING, BORRERO HAS NO STANDING TO CHALLENGE THE SEARCH OF THE BAG AND NO CLAIM TO SUPPRESSION OF THE EVIDENCE SEIZED THEREIN

■ As discussed *supra*, when Borrero was questioned by Agent Winn during the 70 minutes he was detained before the agents discovered the two kilos of cocaine in Loero's bag, he disclaimed ownership of the bag he was carrying and the contents thereof. Despite his disclaimer of ownership, Borrero now challenges the search of that bag and admission of any of the evidence (i.e., the three kilos of cocaine and the employment application bearing his name) found inside it.

Several courts have been called upon to address the question of whether a defendant is entitled to raise a Fourth Amend-

ment challenge to the admission of evidence seized from luggage which he/she has disclaimed ownership in or abandoned, and those courts—including Sixth Circuit—uniformly have answered that question negatively.

In *United States v. Tolbert*, 692 F.2d 1041 (6th Cir.1982), *cert. denied*, 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983), which was a case that also involved a defendant's disclaimer of ownership of luggage in which drugs were found, the Sixth Circuit explained:

> The concept of abandonment considered in the present context is a Fourth Amendment issue and the "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). *Thus the crucial inquiry is "whether governmental officials violated any legitimate expectation of privacy held by the [defendant]." Rawlings v. Kentucky*, 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980).

*Id.*, 692 F.2d at 1044. [Emphasis added.]

In *Tolbert* the Sixth Circuit found that the defendant had no "legitimate expectation of privacy" in the piece of luggage because she disclaimed ownership of that piece of luggage:

> One who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private.

*Id.* at 1045, *quoting, United States v. Miller*, 589 F.2d 1117, 1131 (1st Cir.1978).

*See also, United States v. Knox, supra*, 839 F.2d 285, 293–294 ("The trial court, citing *Tolbert*, properly found that [defendants'] disclaimer [of ownership of the luggage] constituted an abandonment that resulted in appellants' lack of standing to challenge the search." *Id.* at 294); *United States v. Lucci*, 758 F.2d 153 (6th Cir.1985), *cert. denied*, 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985) (defendant who denied ownership of luggage in which four kilograms of hashish oil were found had no standing to seek exclusion of the evidence of the drugs found in his two suitcases). *Cf., United States v. Collis, supra* (Sixth Circuit determined that a defendant, who had initially agreed to accompany drug enforcement agents to the DEA office for questioning but then "bolted" and ran from the agents, and who threw his travel bag—in which contraband was subsequently found—over a fence at the airport while attempting to flee, "abandoned the shoulder bag and failed to establish a legitimate subjective expectation of privacy which would confer standing to raise a fourth amendment challenge to the agents' search of the bag." 766 F.2d at 222.)

Similarly, in *United States v. Moskowitz*, 883 F.2d 1142 (2d Cir.1989), the Second Circuit determined that the defendant's abandonment of luggage precluded his challenging the search of the luggage in his motion to suppress the evidence of drugs found therein:

> It is conceded that Moskowitz's bags were searched without a warrant. Nevertheless, "[s]ince one forfeits any reasonable expectation of privacy upon abandoning one's property, a warrantless search or seizure of abandoned property does not violate the fourth amendment." *United States v. Levasseur*, 816 F.2d 37, 44 (2d Cir.1987); *see Abel v. United States*, 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960). If Moskowitz abandoned his two checked bags, he has no grounds to challenge the legality of a subsequent search of the bags. *See United States v. Knox*, 839 F.2d 285, 293–94 (6th Cir.1988), *cert. denied*, [490] U.S. [1019], 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986).

*Id.*, 883 F.2d at 1147.

In this case, Borrero was asked in Spanish, by Spanish-speaking Border Patrol Agent Winn once they were in the airport DEA office "Is this your bag?" and that Borrero responded "That is not my bag." When Winn asked him where he got the bag he said that he found it on the airplane. Winn then asked him if anything in the bag was his and he responded that

nothing in the bag was his. Borrero, himself, confirmed this with his own testimony at the May 3, 1991 hearing.

Borrero clearly and unequivocally disclaimed ownership of the bag during his "pre-probable cause" investigatory detention on June 5, 1990. By virtue of his affirmative disclaimer of ownership, and by application of the foregoing authorities, Borrero lacks standing to challenge the admission of the drugs and other evidence found in the bag.

■ Borrero has also argued that his statements disclaiming ownership (which ultimately entitled the agents to search his bag without his consent) must be suppressed and the evidence found in the bag must also be excluded as "fruit of a poisonous tree". However, this argument is wholly without merit in this case.

While it is true that there have been instances where courts have ordered the suppression of statements of disclaimer of ownership, together with the evidence obtained as a result of such statements, they have only done so in cases where the courts determined that the law enforcement officers had no "reasonable articulable suspicion" to justify the detention of the defendants. *See e.g., United States v. Madison,* 744 F.Supp. 490, 499–500 (S.D.N.Y.1990). In *Madison,* the court reasoned that the detention of the defendant being unconstitutional, all statements and evidence obtained during such unconstitutional detention had to be suppressed:

> The illegal seizure taints Madison's denial of ownership. Consequently, the warrantless seizure and search of the knapsack and arrest of Madison are tainted as fruits of an unconstitutional seizure.

744 F.Supp. at 500.

By contrast, in cases, such as this one, where the courts have found no constitutional infirmity in the seizure and/or detention of the defendants, the courts uniformly have held that the defendants' disclaimers of ownership and the evidence found in the containers they had denied owning were not "fruits of a poisonous tree." *See, United States v. Tolbert, supra* ("Tolbert's disclaimers of ownership of the luggage

were thus not precipitated by improper conduct on the part of law enforcement agents. Accordingly, the subsequent search of the suitcase, as indicated by the Court's abandonment analysis *supra,* did not offend the Fourth Amendment." 692 F.2d at 1048.) *See also, United States v. Lewis,* 921 F.2d 1294 (D.C.Cir.1990), in which the D.C. Circuit reversed the trial court's determination that the defendant had been the victim of an illegal seizure—which the trial court had found rendered defendant's disclaimer of ownership involuntary and required the suppression of the evidence subsequently found in the bag—and held, "There is no dispute that [defendant] denied ownership of the bag, and no suggestion that her denial was occasioned by any actions that can properly be labeled police misconduct, deception or coercion. We conclude that she abandoned the bag, that the warrantless search was proper, and that the evidence is admissible." *Id.* at 1303.

With respect to Borrero's argument that the agents were not entitled to rely on his statements of denial of ownership of the bag because he had not been read his *Miranda* rights prior to making the statements, the Court finds this argument also to be wholly without merit for several reasons. First, both the Sixth Circuit and the Supreme Court have made clear that *Miranda* warnings are not required in connection with *investigatory airport drug-stop detention questioning,* even when the questioning takes place in a "coercive environment". *See, United States v. Knox, supra,* 839 F.2d at 291–293. *See also, Florida v. Rodriguez,* 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984).

■ Second, the Fifth Amendment—which rights *Miranda* warnings are meant to protect—prohibits only the compelled production of *testimonial evidence,* not physical evidence, such as is the case with the evidence found in Borrero's bag in this action. *See, United States v. Lewis, supra* (reversing the trial court's ruling that because the defendants had not been "Mirandized" prior to one defendant's denial of ownership of luggage subsequently found

to contain drugs and the other defendant's consent to the search of his luggage, explaining "The defendants here were not coerced into producing evidence; and the principal evidentiary fruits of these encounters—Lewis' drugs, and Cothran's drugs, gun, and photo—were not testimonial in nature." 921 F.2d at 1303.)

■ To say that even an "un-Mirandized" custodial disclaimer of ownership of luggage is an incriminating statement in violation of a defendant's Fifth Amendment rights, thereby tainting the evidentiary fruits obtained in the attendant search, seems to this Court to be a Procrustean application of Fifth Amendment policy. The Fifth Amendment protects citizens against the making of uncounselled incriminating statements which could later be used against them. This policy does not include within its protective ambit a statement denying ownership of luggage because to reach the result that the statement is protected, i.e., incriminating, one must first know that the fruit itself is poison. The statement itself denying ownership is clearly not inculpatory; it is only *after* the bag is searched that the contraband is found. In other words, unlike a truly incriminating statement that leads to evidence, here there is no poisonous tree—only poisonous fruit.

Borrero's lack of *Miranda* warnings argument is further flawed because it presupposes that that the agents searched the brown nylon bag because of his disclaimer of ownership. Neither the hearing testimony nor Agent Sykes' "probable cause" affidavit bear that out. Rather, the testimony of both Agent Sykes and Agent Winn, as well as the contents of Sykes' affidavit, establish that the brown nylon bag was searched by the agents pursuant to a warrant which was issued *because the drug detecting canine reacted positively to the presence of drugs in the bag before it was opened.* Moreover, neither Borrero's disclaimer nor his consent was necessary for the canine drug sniff, and had Borrero admitted ownership of the bag but refused to consent to its search, the drug canine

still would have had to sniff the bag and the outcome would have been the same.

## E. SIMILARLY, DEFENDANT BORRERO LACKS STANDING TO CONTEST THE SEARCH OF DEFENDANT LOERO'S BAG OR TO CHALLENGE THE ADMISSIBILITY OF THE COCAINE FOUND THEREIN

■ As the Supreme Court explained in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), "Fourth Amendment rights are personal and may not be asserted vicariously." 99 S.Ct. at 425. *See also, United States v. Salvucci*, 448 U.S. 83, 85, 100 S.Ct. 2547, 2549, 65 L.Ed.2d 619 (1980) ("[D]efendants charged with crimes of possession may only claim the benefits of the exclusionary rule if their own Fourth Amendment rights have been violated.") Thus, when a defendant is aggrieved by an allegedly illegal search of a third party's property, the Fourth Amendment rights of *that* defendant have not been infringed. *Rakas, supra*, 99 S.Ct. at 425.

The Sixth Circuit applied the foregoing principles in *United States v. Knox, supra.* In that airport drug search case, there were three defendants named Knox, Ware and Champegnie. Cocaine was found in a travel bag that defendant Ware carried off the plane. Ware handed the bag to defendant Knox after they deplaned. When stopped and questioned by drug enforcement agents, both Knox and Ware disclaimed ownership of the bag but both nonetheless consented to a search of the bag. When cocaine was found in the bag, all three defendants were arrested. All three defendants moved to suppress the evidence of the drugs. The trial court denied the motion and the Sixth Circuit affirmed.

As to defendants Knox and Ware, the appellate court held that these two defendants, having disclaimed ownership of the bag, had no standing to challenge the search of the bag and no standing to move for suppression of the evidence found therein.

The *Knox* court also found that defendant Champegnie had no standing to chal-

lenge the search of the Ware/Knox bag, explaining

> Appellant Champegnie clearly did not establish or even attempt to establish any expectation of privacy in the bag *since he never had possession of the bag nor did he ever claim any interest in the bag.* Champegnie's lack of standing to contest the search is firmly within the *Rakas* rule that the Fourth Amendment rights of an individual who claims to be aggrieved by the search of a third person's property have not been violated. [Citation omitted.] Therefore, Champegnie may not challenge the search.

839 F.2d at 294.

In this case, no facts have been presented to suggest that Defendant Borrero ever had possession of the bag that Loero was carrying or that he ever claimed any interest in Loero's bag or its contents on June 5, 1990.

Based on the above-cited cases, Borrero not only lacks standing to challenge the admissibility of the evidence found in the nylon bag he was carrying on June 5, 1990, he also lacks standing to object to the admission of the evidence of the two kilos of cocaine found in Loero's bag.

## IV. CONCLUSION

For all of the reasons set forth above in this Memorandum Opinion and Order, and the Court being otherwise fully advised in the premises,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant Nilsson Borrero's Motion to Suppress evidence seized from him on June 5, 1990 be, and hereby is, DENIED.